CHICAGO HOSPITAL RISK POOLING PROGRAM, Plaintiff and Counterdefendant-Appellee and Cross-Appellant, v. ILLINOIS STATE MEDICAL INTER-INSURANCE EXCHANGE, Defendant and Counterplaintiff-Appellant and Cross-Appellee.

First District (2nd Division)    Nos. 1—07—2195, 1—07—2258 cons.

Opinion filed January 26, 2010.

Robert L. Reifenberg, Edward M. Kay, and William Pistorius, all of Clausen Miller P.C., of Chicago, for appellant.

Michael M. Marick and Rebecca R. Haller, both of Meckler Bulger & Tilson LLP, of Chicago, for appellee.

JUSTICE THEIS delivered the opinion of the court:

Plaintiff and counterdefendant, Chicago Hospital Risk Pooling Program (CHRPP), brought an action against defendant and counter-plaintiff, Illinois State Medical Inter-Insurance Exchange (ISMIE), under a theory of equitable contribution seeking to recover a portion of a settlement payment it made on behalf of a physician in an underlying medical malpractice suit. ISMIE filed a counterclaim seeking to recover its defense costs in defending the physician. Subsequently, CHRPP amended its complaint seeking reimbursement under both theories of equitable contribution and equitable subrogation. Ultimately, both parties filed cross-motions for summary judgment on CHRPP's claims and ISMIE filed a motion for summary judgment on its counterclaim.

The circuit court made the following rulings on the parties' cross-motions for summary judgment: (1) judgment in favor of ISMIE and against CHRPP on the equitable contribution claim; and (2) judgment in favor of CHRPP and against ISMIE on the equitable subrogation claim, awarding CHRPP $666,666.67 plus prejudgment interest. In addition, the court granted ISMIE's motion for summary judgment on its counterclaim, awarding it half of its requested attorney fees in the amount of $21,820.94 plus prejudgment interest, finding that ISMIE and CHRPP were equally responsible for the physician's defense costs.

On appeal, ISMIE contends that CHRPP is not entitled to equitable subrogation for certain amounts it purportedly paid on behalf of the physician from its excess trust fund for the following reasons: (1) numerous equitable theories including the doctrines of waiver, estoppel, "unclean hands," and "mend the hold" bar CHRPP from asserting new facts disclosing the involvement of its excess layer of coverage and seeking equitable subrogation for the first time after four years of litigating its reimbursement claim; (2) it artificially constructed occurrence limits to reduce its primary limits of liability; (3) its excess fund does not provide "true excess" coverage; (4) its settlement allocations were never disclosed to ISMIE or documented at the time of the settlement until four years into this litigation; and (5) it cannot now rely on the affidavit of its trust administrator to prove its allocation.

ISMIE also contends that the circuit court erred in granting it only half of its defense costs for the following reasons: (1) CHRPP owed the physician a duty to defend; and (2) the physician's target tender was sufficient to estop CHRPP from seeking contribution and entitling ISMIE to a full reimbursement of its costs.

CHRPP cross-appeals from that part of the trial court's orders awarding ISMIE half of its defense costs on its counterclaim. It

maintains that it owed no duty to defend and the target tender was ineffective to warrant ISMIE's reimbursement. For the reasons that follow, we reverse the judgment of the circuit court granting summary judgment in favor of CHRPP on its equitable subrogation claim and reverse that portion of the judgment of the circuit court granting summary judgment in favor of ISMIE on its counterclaim for only one-half of its defense costs. We remand for further proceedings consistent with this opinion.

BACKGROUND

*Underlying Litigation*

In September 1993, Luz Rivera filed a medical malpractice action against several defendants, including Norwegian-American Hospital (the Hospital), Dr. Enrique Lipezker, Dr. Ha Nguyen, Dr. Carlos Baldoceda, and several nurses, alleging that they were negligent during the labor and delivery of her twins on December 13, 1992, causing the wrongful death of Joshua Rivera and severe neurological damage to the other twin, Joseph Rivera. *Rivera v. Norwegian-American Hospital,* No. 93 L 11731 (the *Rivera* action). Based upon the allegations of the complaint, Dr. Lipezker was sued in his individual capacity as Luz Rivera's private obstetrician providing prenatal care.[1] The Hospital was sued for its institutional or direct corporate negligence and its vicarious liability for the acts of its employees. Drs. Nguyen and Baldoceda and several nurses were sued in their individual capacity and in their capacity as agents or employees of the Hospital.

*The Parties Involved in This Litigation*

At the time of the incident, Dr. Baldoceda had entered into an oral employment agreement with the Hospital under which he agreed to provide services to certain obstetrical patients as a hospital-employed "house physician." As part of his agreement, the Hospital agreed to provide him with insurance coverage for treatment he rendered as an employed house physician. The Hospital paid a premium for coverage on his behalf.

This litigation involves the medical malpractice coverage afforded to Dr. Baldoceda as an employed physician at the Hospital through CHRPP while acting within the scope of his employment, and the medical malpractice coverage afforded to him through ISMIE, his private professional liability insurance carrier.

---

[1]The record reveals that he was insured by ISMIE and settled with the Rivera plaintiffs for $750,000 in a separate proceeding.

CHRPP administers a trust established pursuant to the Religious and Charitable Risk Pooling Trust Act (the Risk Pooling Act or Act) (215 ILCS 150/1 *et seq.* (West 1998)), whereby certain participating nonprofit hospitals pool certain risks associated with the care and treatment provided to their patients. Under the seventh amended trust agreement (the Trust Agreement or the Primary Trust), participating hospitals agree to contribute certain sums to CHRPP in consideration of CHRPP's promise to make payments on behalf of the Hospital and other "Covered Persons," including Hospital employees while acting within the scope of their employment, for a "Covered Loss." The term "Covered Loss" is defined under appendix A, section 1.2, of the Trust Agreement as follows:

"All sums that any Covered Person, as defined herein, shall become legally obligated to pay as damages, including punitive damages:

\* \* \*

(3) because of Malpractice Injury, to which this Trust Agreement applies, arising directly or indirectly out of or in connection with \*\*\* the rendering of or failure to render patient care or professional services by a Covered Person."

The limits of liability for the period of participation were $1 million per occurrence and $3 million in the aggregate. It is undisputed that the Hospital was a participant in CHRPP and both the Hospital and Dr. Baldoceda, as an employee of the Hospital acting within the scope of his duties, were "Covered Persons" under the Trust Agreement.

The Hospital was also a signatory to a separate excess trust agreement (the Excess Trust) also administered by CHRPP, which provides coverage "in excess of a \*\*\* professional liability primary program or plan which provides, at a minimum, $1,000,000 for each occurrence and a $3,000,000 annual aggregate." The limits of liability set forth in the Excess Trust are $10 million per occurrence and $20 million in the aggregate. Dr. Baldoceda was also considered a "Covered Person" under the Excess Trust.

ISMIE provided Dr. Baldoceda with professional liability insurance under a claims-made policy for the claim period July 1, 1993, to July 1, 1994. The ISMIE policy was subject to a $1 million per-person limit of liability and a $3 million aggregate limit.

*CHRPP's Coverage Position*

On October 13, 1993, the Hospital notified CHRPP of the *Rivera* action. CHRPP agreed to defend the Hospital without a reservation of rights. Thereafter, on about March 24, 1994, Dr. Baldoceda was served with the underlying complaint and notified the Hospital of the suit. In

turn, Gerry Stroka, the Hospital risk manager, notified CHRPP that Dr. Baldoceda sought coverage. At that time, Cathy Allen, the supervisor of claims management services at CHRPP, advised the Hospital that Dr. Baldoceda was afforded coverage under CHRPP as a "house Doctor," but indicated that "prior to embarking on a defense," there were questions about his employment status and insurance status. Stroka was informed that he had to report the matter to ISMIE because there was "always a possibility that the [ISMIE] policy may apply."

CHRPP was then informed by the Hospital that at the time of the incident, Dr. Baldoceda was functioning as a house physician under an oral contract. Thereafter, in an internal CHRPP memorandum dated May 16, 1994, from Bob Abney, the director of claims management services for CHRPP, to Allen, Abney indicated as follows:

"My bottom line thinking is that we will have to provide coverage to Drs. Nguyen and Baldoceda. Both physicians were disclosed to CHRPP in 9/92 as employed physicians. *** CHRPP collected a premium from the hospital for both physicians."

Abney further indicated that it was his opinion that "if litigated we would not prevail in our effort to avoid coverage based on the absence of an actual employment relationship." Abney advised that CHRPP should send Dr. Baldoceda a letter indicating that "we are undertaking his defense under a reservation of rights in view of his uncertain status at the time of this occurrence and since he might have other applicable insurance coverage."

In an internal CHRPP memorandum dated July 18, 1994, Allen indicated that on July 14, 1993, ISMIE contacted CHRPP and inquired as to whether CHRPP intended to defend and indemnify Dr. Baldoceda. In response, Allen informed ISMIE that it was "investigating the coverage issue" and that CHRPP believed it was excess to the ISMIE policy in this instance.

Thereafter, in a letter dated July 20, 2004, CHRPP advised Baldoceda of its coverage position. Therein, it indicated that it understood that Baldoceda was insured under a policy with ISMIE and that ISMIE agreed to provide him with a defense. Based upon CHRPP's interpretation of its "other insurance" clauses, CHRPP advised Baldoceda that CHRPP "does not provide primary insurance coverage to you with respect to the *Rivera* action," and that ISMIE had "the primary defense and indemnity obligations in connection with the lawsuit." CHRPP also advised Baldoceda of its limits of liability. It further indicated that the Hospital "is also covered under an excess trust, which provides coverage only upon the prior exhaustion of all available primary coverage (such as the ISMIE policy)." In addition,

CHRPP indicated that it was reserving all of its rights with respect to whether Baldoceda was qualified as a "Covered Person" under the trust agreements and generally reserved all of its rights and defenses under its Primary and Excess Trusts and was not waiving any provisions of the trust agreements or any defenses.

It did not file a declaratory judgment action to resolve its coverage position with Dr. Baldoceda. The record reveals that CHRPP undertook the defense of the Hospital and its nurses. It also undertook the defense of Dr. Nguyen, who apparently had no other insurance available to him.

### ISMIE's Coverage Position

ISMIE was also notified of the *Rivera* action in October 1993 through Dr. Lipizker. Subsequently, Dr. Baldoceda notified ISMIE on April 14, 1994, that he had been served in the *Rivera* action. In a letter dated April 26, 1994, ISMIE advised Dr. Baldoceda that it was undertaking his defense without a reservation of rights and informed him that there were separate $1 million limits of liability available for each of the twins.

### Padilla Decision Is Rendered

Less than two weeks after CHRPP advised Dr. Baldoceda of its coverage position, on August 1, 1994, the Illinois Appellate Court rendered its decision in *Padilla v. Norwegian-American Hospital, Inc.*, 266 Ill. App. 3d 829 (1994). Therein, CHRPP and ISMIE litigated the meaning and coordination of their "other insurance" clauses. As in this case, a Norwegian-American Hospital employed physician had two policies which potentially provided concurrent coverage to him. CHRPP agreed to settle the underlying medical malpractice case against the physician and then filed a complaint against ISMIE seeking a declaration that ISMIE was the primary insurer and that CHRPP provided coincidental excess coverage based upon the "other insurance" clauses in ISMIE's policy and CHRPP's Trust Agreement. *Padilla*, 266 Ill. App. 3d at 830-31. On appeal, after construing the identical "other insurance" clauses in the ISMIE policy and CHRPP Trust Agreement that exist in the present case, the court rejected CHRPP's position, holding instead that the two clauses were incompatible and, therefore, warranted proration of liability. *Padilla*, 266 Ill. App. 3d at 837-38.

Nevertheless, after the decision was rendered, CHRPP continued to maintain its previous position with regard to coverage for Dr. Baldoceda. Specifically, with respect to Dr. Baldoceda's defense, during the pendency of the lawsuit in August 1995, an internal memorandum

from Abney to Allen indicated that CHRPP did not "see any sense in trying to work out some type of Baldoceda defense sharing agreement with [ISMIE]" because (1) CHRPP's position was that Dr. Baldoceda was not a covered person under the trust agreement; and (2) that ISMIE's coverage should be primary. Again, in February 1996, in a letter from ISMIE to CHRPP, ISMIE took the position that the two policies were co-primary. Additionally, despite the fact that Allen stated in her deposition that she was probably aware of the *Padilla* decision, Allen responded to ISMIE on February 27, 1996, reiterating that "it is our position that ISMIE provides primary coverage to Dr. Baldoceda."

*ISMIE's Physician Review Committee Recommends Settlement*

By letter dated June 13, 1996, ISMIE advised Dr. Baldoceda that its physician review committee recommended that ISMIE attempt settlement negotiations. It had been identified that a potential verdict against Dr. Baldoceda could be in excess of $4 million. Thereafter, Dr. Baldoceda signed an authorization to settle with respect to Joshua Rivera, allowing ISMIE to pursue settlement negotiations on his behalf. However, no settlement was ever made at that time.

*Dr. Baldoceda's Attempt to Target Tender to CHRPP*

By letter dated December 13, 1996, Dr. Baldoceda wrote to the chief executive officer of the Hospital, requesting that CHRPP provide him with his primary coverage and insisted that he be offered a defense through CHRPP. Therein, he stated in pertinent part as follows:

"Notwithstanding my ISMIE coverage, I look to [Norwegian], and its insurer, to provide me with my primary and excess layer of malpractice coverage for this occurrence."

Furthermore, he requested at this juncture that the Hospital's defense counsel also defend him in the suit. At the same time, on December 23, 1996, Dr. Baldoceda's ISMIE-retained counsel wrote a letter on his behalf to the Hospital's counsel. Therein, he stated that it was Dr. Baldoceda's desire to have the Hospital insure and indemnify his conduct under its primary and excess insurance through CHRPP and requested a defense for the balance of the litigation from CHRPP. The letter further provided that in making this choice, Dr. Baldoceda was relying upon current Illinois law, including the case of *Institute of London Underwriters v. Hartford Fire Insurance Co.*, 234 Ill. App. 3d 70 (1992).

In an affidavit filed by ISMIE's retained counsel for Dr. Baldoceda, which was filed during the pendency of the cross-motions for summary judgment, counsel stated that by his letter of December 23, 1996, he did not intend to indicate that Dr. Baldoceda was "in any way abandoning his rights to coverage under the ISMIE policy, rather

he was merely attempting to prioritize how his two lines of coverage (CHRPP and ISMIE) were to be applied to the *Rivera* action."

In response to the December 23 letter, CHRPP sent a letter to ISMIE's counsel dated March 6, 1997, reiterating its July 1994 coverage position that "its policy was secondary," and that it reserved its rights with respect to whether Dr. Baldoceda was a "Covered Person," as well as with respect to "all other policy and coverage defenses." Notwithstanding its position, CHRPP proposed the following compromise with ISMIE without prejudice to its rights or to the Hospital's rights:

> "(1) that the defense counsel it has assigned to defend [the Hospital] and Dr. Nguyen *** also represent Dr. Baldoceda; (2) that ISMIE pay one-third of [the] defense costs; and (3) that ISMIE agree in writing to contribute 45% toward any total judgment or total settlement against all defendants."

ISMIE did not respond to the letter.

*Dr. Baldoceda Files a Declaratory Judgment Action*

In August 1997, Dr. Baldoceda filed a declaratory judgment action against CHRPP seeking a declaration that: (1) CHRPP owed him a duty to defend in the *Rivera* action pursuant to its Primary Trust Agreement with the Hospital; (2) that CHRPP owed him a duty to indemnify him pursuant to its Primary and Excess Trust Agreements; (3) that CHRPP's duty to defend and indemnify him was exclusive due to his election to have CHRPP, not ISMIE, respond to the *Rivera* action; and (4) that CHRPP breached its duty to defend him and, therefore, was estopped from asserting any policy defenses against him.

*CHRPP Settles the Rivera Action on Behalf of All Defendants*

By August 1997, plaintiffs in the *Rivera* action had valued the lawsuit between $15 and $25 million. On August 13, 1997, counsel for the *Rivera* plaintiffs sent a letter to the Hospital's counsel reiterating its settlement demand of $5 million for a complete settlement of the litigation against all remaining defendants. The *Rivera* plaintiffs took the position that based upon their medical experts and analysis of the case, the relative culpability of Dr. Baldoceda, Dr. Nguyen, and the nursing staff should be shared equally. In a CHRPP staff report to the committee on claims management, it was noted that a declaratory judgment action was pending against CHRPP and it was recommended that CHRPP attempt to settle the matter for $3 million and try to "recoup a contribution" from ISMIE at a later date.

Thereafter, CHRPP entered into settlement negotiations and in a letter dated February 26, 1998, advised ISMIE that it anticipated a settlement of the *Rivera* action would be reached for a total of $3 million and that it believed it was in the best interest of all defendants to settle the case. CHRPP further advised ISMIE in pertinent part as follows:

"As you will note, the plaintiff based this settlement demand upon plaintiff's contention that Dr. Baldoceda is responsible for one-third of the collective liability of all defendants.

* * *

Any settlement agreement that CHRPP may reach with the plaintiff will be based on the plaintiff's evaluation of the respective fault of the defendants. Of course, any payments made by CHRPP on behalf of Dr. Baldoceda will be made pursuant to a full reservation of all of CHRPP's rights to recoupment of such payment from ISMIE."

CHRPP received no response from ISMIE to its letter of February 26, 1998. Thereafter, on March 18, 1998, plaintiffs in the *Rivera* action filed a "petition to approve final minor's settlement" and a "petition for final settlement of wrongful death action." The petitions specified that $1 million of the total $3 million settlement amount was paid on behalf of the Hospital and the nurses; $1 million was paid on behalf of Dr. Nguyen; and $1 million was paid on behalf of Dr. Baldoceda. The petitions also specified that out of the total $3 million, $750,000 was apportioned to the estate of Joshua Rivera and $2.25 million was apportioned to Joseph Rivera.

On March 23, 1998, plaintiffs in the *Rivera* action executed a release and settlement agreement in favor of all defendants. Thereafter, Dr. Baldoceda also voluntarily dismissed his declaratory judgment action against CHRPP.

### CHRPP Seeks Equitable Contribution From ISMIE

Two weeks later, on April 8, 1998, CHRPP filed its original complaint for equitable contribution against ISMIE. Therein, it sought contribution for $500,000, which represented one-half of the $1 million it paid in settlement on behalf of Dr. Baldoceda in the *Rivera* action. CHRPP cited the concurrent primary coverage of ISMIE and the *Padilla* case in support of its basis for recovery and attached a copy of its Primary Trust Agreement.

In its answer and affirmative defense, ISMIE asserted, *inter alia*, that CHRPP was estopped from obtaining equitable contribution from ISMIE because it refused Dr. Baldoceda's target tender and breached its contract with him. CHRPP responded that the target tender or

selective tender rule, as it is alternatively referred to, could only apply to traditional insurance companies, as a risk-pooling trust it was not to be treated as insurance, and, therefore, it was not subject to the target tender rule.

Ultimately, the circuit court granted a joint motion for interlocutory appeal and certified the following questions for appeal pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308): (1) whether CHRPP's status as a risk-pooling trust established under the Illinois Religious and Charitable Risk Pooling Trust Act, required that it be treated differently than a traditional insurance company for purposes of applying the "selective tender" rule; and (2) whether this type of trust could state a cause of action for equitable contribution, unjust enrichment, or quantum meruit against ISMIE, an insurance company, to recover one-half of a settlement payment it made on behalf of a physician covered by both ISMIE and CHRPP.

In *Chicago Hospital Risk Pooling Program v. Illinois State Medical Inter-Insurance Exchange*, 325 Ill. App. 3d 970, 979 (2001) (*CHRPP I*), this court answered the certified questions, holding that notwithstanding its status as a risk-pooling trust, nothing in the Act exempted CHRPP from its common law contractual rights, duties, and obligations as expressed in its Trust Agreement. *CHRPP I*, 325 Ill. App. 3d at 977-78. Nothing in the Act or the CHRPP Trust Agreement limited Dr. Baldoceda's right to exclusively select his CHRPP coverage and knowingly forgo his ISMIE coverage. *CHRPP I*, 325 Ill. App. 3d at 978-79. We noted that the key question was not whether the trust was traditional insurance, but whether CHRPP's trust agreement and ISMIE's policy covered the risk to Dr. Baldoceda on the same basis such that the coverage provided to him was concurrent. Where CHRPP had a concurrent obligation to cover the risk, Dr. Baldoceda had the "paramount" right to exclusively select his CHRPP coverage over his ISMIE coverage. *CHRPP I*, 325 Ill. App. 3d at 979-80. Accordingly, CHRPP's status as a risk-pooling trust did not defeat the application of the selective tender rule.

Nevertheless, we held that there were many unresolved factual and legal questions that were not fully briefed on appeal that could impact the ultimate determination of whether the selective tender rule would apply to CHRPP in this case, including: (1) whether CHRPP had a duty to defend Dr. Baldoceda; and (2) whether Dr. Baldoceda properly perfected his selective tender. *CHRPP I*, 325 Ill. App. 3d at 980.

With respect to the second certified question, we held that if the selective tender was not perfected, CHRPP could seek equitable contribution from ISMIE even though it was a risk-pooling trust based

on its concurrent indemnity obligation. It should then be treated no differently than the parties in *Padilla* with respect to sharing its liability. *CHRPP I*, 325 Ill. App. 3d at 983. This court was not informed of any involvement of any excess trust agreement or made aware that any allocation of the settlement payment on behalf of Dr. Baldoceda arose out of any excess trust funds. The case was remanded to the circuit court for further proceedings.

*CHRPP Files a Second Amended Complaint*

On December 10, 2002, CHRPP sought and was granted leave to file a second amended complaint. Therein, it amended its claim for equitable contribution and added a new claim for equitable subrogation. Under its amended equitable contribution theory, it alleged that the $3 million settlement was allocated equally among the settling defendants and between the Primary Trust and the Excess Trust such that it allocated $1 million of the total $3 million to the Primary Trust and $2 million to the Excess Trust. It further alleged that of the $1 million owed by Dr. Baldoceda, $333,333.33 was paid on his behalf from the Primary Trust, and that $666,666.67 was paid on his behalf from the Excess Trust. Based on this allocation, CHRPP sought reimbursement from ISMIE "for one-half of the settlement payment made on behalf of Dr. Baldoceda in the *Rivera* Action, i.e., is [sic] the same $333,333.33 amount which CHRPP allocated to the primary trust."

Under its new equitable subrogation theory, it alleged that after CHRPP was responsible for $333,333.33 from the Primary Trust, and ISMIE contributed $333,333.33 from its policy through equitable contribution, CHRPP became equitably subrogated to the rights of Dr. Baldoceda to recover the remaining $333,333.33 sum from ISMIE, that portion of the remaining settlement it allocated on his behalf from the Excess Trust.

Thereafter, ISMIE filed a motion to dismiss the second amended complaint pursuant to section 2—619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2—619(a)(9) (West 2006)), alleging that the claims were barred by the law of the case, judicial estoppel and the "mend the hold" doctrine. The trial court denied the motion to dismiss.

Ultimately, the parties filed cross-motions for summary judgment, and the court granted ISMIE leave to pursue additional discovery. ISMIE also moved to strike certain affidavits of Kenneth Skertich, CHRPP's trust administrator, which had been filed in support of CHRPP's motion for summary judgment.

According to Skertich's affidavit, dated June 5, 2005, based on the fact that the underlying plaintiffs settled for equal amounts and based on their assessment that each of the three defendants' liability was to be allocated equally, CHRPP divided the primary limits of liability equally between the three defendants. Thus, $333,333.33 (one-third) of the $1 million Primary Trust limits were available to Dr. Baldoceda. Additionally, Skertich stated that $666,666.67 (two-thirds) of the $2 million CHRPP paid under the Excess Trust were paid on behalf of Dr. Baldoceda.

In support of this allocation, Skertich attached to his affidavit an unsigned "claim file disbursement certificate," dated March 23, 1998, which indicated that CHRPP funded the $3 million settlement by paying $1 million from the Primary Trust ($143,623 from its "A Fund" account and $856,377 from its "B Fund" account) and $2 million from an account listed as "Excess." One check was issued payable to the plaintiffs for $3 million. No further allocation was documented on the certificate regarding the amounts paid on behalf of Dr. Baldoceda or any of the underlying defendants from the Primary Trust and the amounts paid from the Excess Trust.

ISMIE additionally moved for summary judgment on its counterclaim for reimbursement of its defense costs and later moved for leave to amend to seek prejudgment interest.

On July 9, 2007, the trial court entered judgment in favor of ISMIE on CHRPP's equitable contribution claim (count I) finding that CHRPP did not pay more than its fair share under the Primary Trust. The trial court entered judgment in favor of CHRPP on its equitable subrogation claim (count II) finding that $666,666.67 of the settlement on behalf of Dr. Baldoceda was paid from the Excess Trust and that ISMIE was primarily liable for that amount. The court subsequently awarded prejudgment interest in the amount of $310,122.72, calculated from the date of the *Rivera* settlement. The court also denied ISMIE's motion to strike the Skertich affidavit of June 2005.

With respect to ISMIE's counterclaim, the trial court entered judgment in favor of ISMIE for half of the attorney fees it expended in defending Dr. Baldoceda, reasoning that ISMIE and CHRPP were equally responsible for them because CHRPP had a duty to defend and the letters to CHRPP did not constitute a sufficient selective tender. The court also subsequently awarded prejudgment interest to ISMIE in the amount of $10,163.18, calculated from the date of the *Rivera* settlement.

On July 11, 2007, CHRPP also filed its third amended complaint to conform the pleadings to the proof, revising its allegations related to its equitable subrogation claim, and seeking reimbursement in the

amount of $666,666.67 for the amount it paid under its Excess Trust. ISMIE timely filed its appeal in case number 1—07—2195. Thereafter, CHRPP timely filed its cross-appeal in case number 1—07—2258. The appeals were subsequently consolidated by this court.

## ANALYSIS

ISMIE's appeal arises, in part, from the circuit court's ruling granting summary judgment in favor of CHRPP on its equitable subrogation claim. Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2006); *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102, 106 (2007). When parties file cross-motions for summary judgment, they concede the absence of a genuine issue of material fact and invite the court to decide the questions presented as a matter of law. 735 ILCS 5/2—1005(c) (West 2006). We review appeals from summary judgment rulings *de novo*. *Kajima*, 227 Ill. 2d at 106.

*Equitable Subrogation*

■ "Subrogation has been defined as the substitution of another person in the place of a claimant whose rights he succeeds to in relation to the debt or claim asserted, which he has paid involuntarily." *Wausau Insurance Co. v. All Chicagoland Moving & Storage Co.*, 333 Ill. App. 3d 1116, 1121 (2002). An insurer who indemnifies its insured for a loss may be subrogated to the rights of the insured against the party at fault under the equitable doctrine that the economic burden " 'should be shifted to the party responsible for the loss.' [Citation.]" *State Farm General Insurance Co. v. Stewart*, 288 Ill. App. 3d 678, 686 (1997). Thus, its purpose is traditionally grounded in equity to work out an adjustment between the parties "by securing the ultimate discharge of a debt by the person who in equity and good conscience ought to pay it." 16 Couch on Insurance 3d §222:8, at 222-30 (2005).

■ To establish a right to equitable subrogation, CHRPP bears the burden to establish the following: (1) that the defendant is primarily liable to the insured for a loss under a policy of insurance; (2) that the plaintiff is secondarily liable to the insured for the same loss under its policy; and (3) the plaintiff discharged its liability to the insured and at the same time extinguished the liability of the defendant. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 316-17 (2004).

ISMIE presents several arguments, focusing on the second element of an equitable subrogation claim, contending that, as a matter of law and equity, CHRPP cannot support its position that it is secondarily liable for the loss under its Excess Trust. ISMIE maintains that CHRPP has failed to establish that in settling the *Rivera* action, CHRPP's right to subrogation was triggered for amounts CHRPP allegedly paid under its Excess Trust on behalf of Dr. Baldoceda. We begin with an analysis of ISMIE's equitable contentions.

ISMIE contends that CHRPP waived any right to reimbursement under its Excess Trust because at the time of the *Rivera* settlement and for the first four years of this litigation, CHRPP never asserted that any of the settlement funds were paid on behalf of Dr. Baldoceda out of its Excess Trust. Instead, ISMIE maintains that in filing its original complaint for equitable contribution after the settlement, CHRPP affirmatively represented that the payment was made from its Primary Trust. ISMIE argues that this new inconsistent revelation came only after an unsuccessful appeal to this court in *CHRPP I* when it filed its second amended complaint, attached its Excess Trust Agreement for the first time, and changed its facts and theory to seek equitable subrogation in an attempt to avoid a valid target tender by Dr. Baldoceda.

In support of its waiver argument, ISMIE cites *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307 (2004). In *Home*, the supreme court reiterated the principles of waiver in the context of an insurer's right to seek equitable remedies against another insurer. The court articulated that "[w]aiver arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right." *Home*, 213 Ill. 2d at 326. The court explained that a wavier can be express or implied and can arise from the acts, words, conduct or knowledge of an insurer. *Home*, 213 Ill. 2d at 326. "An implied waiver arises when conduct of the person against whom waiver is asserted is inconsistent with any intention other than to waive it." *Home*, 213 Ill. 2d at 326.

In *Home*, the insurer seeking equitable subrogation asserted its status as an excess insurer for the first time in the subrogation action. *Home*, 213 Ill. 2d at 327. Its position that it was excess was not raised until after the underlying claim was settled. The insurer never advised the nonsettling insurer of its position that its policy was excess and the insurer had originally agreed to share the cost of defense and indemnity on a 50/50 basis. The insurer did not advise the other insurer that it would be seeking a full reimbursement of any settlement as an excess insurer. *Home*, 213 Ill. 2d at 327-28.

The supreme court held that "an insurer by its conduct may waive rights against another insurer." *Home*, 213 Ill. 2d at 327. It explained that an insurer desiring to reserve its rights against a second insurer must make this position clear in its correspondence with the second insurer. It is also good practice to include such reservation language in any settlement agreement or order, and provide a copy of it to the nonsettling insurer. *Home*, 213 Ill. 2d at 327. Under these circumstances, the supreme court concluded that the totality of the insurer's conduct was inconsistent with its claim that it would seek a full reimbursement for the settlement from the other insurer. It held that the insurer was "presumed to know the contents of its own policy and that it was an excess insurer." *Home*, 213 Ill. 2d at 327. It originally asserted that it would share in the costs of defense and indemnity on a 50/50 basis and at the time of the settlement sought reimbursement for only half of the settlement costs. *Home*, 213 Ill. 2d at 327-28. Therefore, the court held that the insurer waived its right to seek a full reimbursement on the newly identified basis that it was excess. *Home*, 213 Ill. 2d at 328.

Here, ISMIE was aware of the existence of CHRPP's Excess Trust from the outset of the underlying litigation. In December 1996, Dr. Baldoceda and his ISMIE-appointed counsel sought coverage under both the Primary and Excess Trust Agreements. ISMIE was also aware of a potential verdict range being well over the primary limits of liability. In the letter from CHRPP to ISMIE dated February 26, 1998, regarding settlement negotiations, ISMIE was informed that the case would settle for $3 million for all of the defendants and that any settlement agreement would be based on the plaintiff's evaluation of the respective fault of the defendants as being equal. The letter also advised ISMIE that any payments made by CHRPP on behalf of Dr. Baldoceda would be made "pursuant to a full reservation of all of CHRPP's rights to recoupment of such payments from ISMIE." Thus, at the time of CHRPP's correspondence, ISMIE was aware of the existence of the Excess Trust and was on notice of the potential for the Excess Trust to be implicated because a settlement of $1 million on behalf of Dr. Baldoceda could at least potentially exceed CHRPP's primary limits of liability.

However, whether the Excess Trust was actually implicated by the settlement on behalf of Dr. Baldoceda depended on: (1) whether there was a single occurrence; and (2) how the allocation between primary and excess funds was structured among all of the *Rivera* defendants in the settlement. Here, CHRPP settled the *Rivera* action for $3 million and the settlement documents revealed that $1 million was paid on behalf of the Hospital and nurses, $1 million on behalf of Dr. Nguyen,

and $1 million on behalf of Dr. Baldoceda. Nevertheless, there was no further allocation by CHRPP in the settlement proceedings relative to what portion of the $1 million paid on behalf of Dr. Baldoceda was paid out of CHRPP's Primary Trust and what portion, if any, was paid out of its Excess Trust.

In Illinois it has been held that a primary insurer may pay its entire policy limit in settlement of a single claim against a single insured without breaching any duties of good faith, even if its other insureds would be left without a defense or indemnification. *Country Mutual Insurance Co. v. Anderson*, 257 Ill. App. 3d 73, 80 (1993); see also *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23, 48-53 (1987). Thus, assuming there was a single occurrence, CHRPP could have chosen to pay the limits of its Primary Trust on behalf of Dr. Baldoceda, and there would have been no need for the Excess Trust to be implicated with respect to him.

There was additionally no indication by CHRPP at the time of the *Rivera* settlement as to whether the $3 million payment was made based upon a determination that the death and malpractice related to the Rivera twins constituted a single occurrence or multiple occurrences. CHRPP's Primary Trust had a $1 million limit for each occurrence and a $3 million aggregate limit. If there were multiple occurrences, then there also would be no need for the Excess Trust to be implicated. As our supreme court recently reiterated in *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453-54 (2009), once an insured establishes a right to coverage, it is an insurer's duty to establish that a limitation in the policy applies. Thus, if CHRPP maintained that its primary limits were exhausted in settlement by its $1 million per-occurrence limit of liability rather than its $3 million aggregate limit, it bore the burden to establish that the deaths of the twins constituted one occurrence. *Fay*, 232 Ill. 2d at 455.

CHRPP did not file a declaratory judgment action to resolve this issue. Rather, within weeks of the settlement, CHRPP filed its original complaint for equitable contribution. Equitable contribution applies to "multiple, concurrent insurance situations and is only available where the concurrent policies insure the same entities, the same interests, and the same risks." *Home*, 213 Ill. 2d at 316. CHRPP sought $500,000 or one-half of the $1 million it paid on behalf of Dr. Baldoceda. It specifically claimed that its concurrent primary coverage allowed it to seek such a reimbursement. In doing so, it implicitly agreed that it also owed $500,000 and that its Excess Trust was not implicated with respect to any settlement on behalf of Dr. Baldoceda. Indeed, it is well established that the doctrine of equitable contribution is not applicable as between primary and excess insurers. *Home*, 213 Ill. 2d at 316-17.

Thus, the only reasonable inferences that can be drawn from CHRPP's conduct in seeking equitable contribution for $500,000 rather than equitable subrogation under its Excess Trust is that CHRPP either (1) allocated the $1 million it paid on behalf of Dr. Baldoceda from the Primary Trust; or (2) construed the trust such that there were multiple occurrences and, therefore, believed it was obligated to pay the entire settlement of $3 million based upon its aggregate limits of liability under the Primary Trust. Under either inference, CHRPP's conduct was completely inconsistent with the notion that its Excess Trust was implicated as to the $1 million payment made on behalf of Dr. Baldoceda.

CHRPP continued to hold its original position for four years of litigation, including an appeal to this court where it maintained that (1) it was entitled to equitable contribution because both CHRPP and ISMIE covered the risk on the same basis as co-primary insurers; and (2) that an appeal to this court under Supreme Court Rule 308 (155 Ill. 2d R. 308) would materially advance the litigation. Upon remand, it then sought to change the facts and theories, seeking equitable subrogation for the first time in 2002.

■ As expressed in *Home*, CHRPP "was presumed to know the contents of its own policy and that it was an excess insurer." *Home*, 213 Ill. 2d at 327. This holds especially true here, where CHRPP was in the unique position of controlling both the primary and excess funds and structuring the allocation of those funds among its insureds. The totality of CHRPP's affirmative conduct for the first four years of litigation was completely inconsistent with any intention to seek reimbursement under a different set of facts in which it maintained that CHRPP and ISMIE did not share the risk on the same basis and that two-thirds of the settlement was paid out of its Excess Trust instead of its Primary Trust. Accordingly, CHRPP waived any right to seek reimbursement for two-thirds of the settlement from ISMIE by asserting that it was entitled to no more than one-half of its settlement payment as a co-primary insurer and by originally agreeing to pay on a 50/50 basis with ISMIE. *Home*, 213 Ill. 2d at 327.

Our holding is consistent with and solely based upon the equitable principles of waiver as set forth in *Home*, and is not based upon any deficiencies in pleading a cause of action. Nevertheless, we recognize that section 2—613(b) of the Illinois Code of Civil Procedure (735 ILCS 5/2—613(b) (West 2006)) authorizes the pleading of facts in the alternative. That section provides in pertinent part as follows:

"When a party is in doubt as to which of two or more statements of fact is true, he or she may, regardless of consistency, state them in the alternative or hypothetically in the same or different counts or defenses." 735 ILCS 5/2—613(b) (West 2006).

Thus, a party may make inconsistent statements of fact in a pleading when the party is in doubt as to which statement is true. However, when the nature of the statements are such that the plaintiff must know which statement is true, inconsistent pleading is improper. *Pioneer Bank & Trust Co. v. Austin Bank of Chicago*, 279 Ill. App. 3d 9, 14 (1996). Here, to the extent that CHRPP attempted to plead in the alternative, it was improper. All of the facts necessary to seek reimbursement from ISMIE were within CHRPP's control. As *Home* explains, CHRPP was presumed to know at the time it sought reimbursement which settlement funds were paid on behalf of Dr. Baldoceda under its Primary Trust or under its Excess Trust. Indeed, there was no genuine doubt about the facts. CHRPP's trust administrator was eminently aware of how the funds were allocated. Yet, CHRPP affirmatively chose to seek equitable contribution under a different set of facts instead, thereby intentionally relinquishing a known right to equitable subrogation. *Home*, 213 Ill. 2d at 326. Accordingly, the circuit court erred in granting summary judgment in favor of CHRPP on its equitable subrogation claim.

As a result of our holding, we need not address ISMIE's other contentions regarding CHRPP's right to equitable subrogation.

*Counterclaim*

We next address ISMIE's contention that the circuit court erred in granting only part of its motion for summary judgment on its counterclaim to recover defense costs it incurred in defending Dr. Baldoceda in the underlying action. Specifically, ISMIE asserts the court erred in awarding it only half of its costs because Dr. Baldoceda perfected his selective tender of the defense of the underlying action to CHRPP and, therefore, the defense obligations were not owed equally. CHRPP maintains in its cross-appeal that it owed no defense costs because it had no contractual duty to defend Dr. Baldoceda under its Primary Trust and even assuming a duty to defend, Dr. Baldoceda did not effectively target tender CHRPP so as to impose exclusive payment of defense costs on CHRPP.

CHRPP contends that it had no contractual duty to defend Dr. Baldoceda under its Primary Trust Agreement and, therefore, it is not obligated to reimburse ISMIE for its defense costs. Illinois has recognized that a duty to defend arises from, and is limited by, the expressed undertaking to defend as stated in the contract of insurance. See *Zurich*, 118 Ill. 2d at 48. Thus, we are called upon to construe the language of the Trust Agreement. The construction of a contract is a question of law subject to *de novo* review. See *Fay*, 232 Ill. 2d at 455. A court's primary objective in construing a contract is to ascertain

and give effect to the intention of the parties as expressed in the agreement. *Fay*, 232 Ill. 2d at 455. A contract should be construed as a whole, and such construction should be a natural and reasonable one. *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 371 (2007); *Compton v. Country Mutual Insurance Co.*, 382 Ill. App. 3d 323, 330 (2008). Additionally, it is presumed that parties contract with knowledge of the existing law, and the laws in existence at the time a contract is executed are considered part of the contract. *Braye v. Archer-Daniels-Midland Co.*, 175 Ill. 2d 201, 217 (1997).

Article V of the Trust Agreement addresses the powers, rights and duties of the trustees under the trust. Section 5.7 provides in pertinent part as follows:

"The Trustees shall have the right and duty to defend any suit brought against the Hospital alleging a Covered Loss, even if any of the allegations of the suit are groundless, false or fraudulent."

CHRPP's position is that Dr. Baldoceda does not qualify as a Hospital and, therefore, the duty to defend him does not exist. "Hospital" is defined in the Trust Agreement as "any one or all of the Participating Hospitals, as the context may require." "Participating Hospitals" refers to the hospital signatories of the Trust Agreement. The term is not further defined. Nevertheless, in other contexts our supreme court has viewed this term broadly as necessarily more than the four walls in which medical treatment is provided. "[I]t is also composed of persons, including nurses, who act on behalf of the hospital in providing treatment for patients." *Penkava v. Kasbohm*, 117 Ill. 2d 149, 156 (1987) (construing the term "hospital" in a statute of limitations provision to include the nurses who work there).

Moreover, under the doctrine of *respondeat superior*, "any suit brought against the Hospital" for its vicarious liability necessarily encompasses a suit against its agents. The reasoning stems from the legal relationship between master and servant. When an action is brought against a master based on the alleged negligent acts of his servant his liability is derivative. *Towns v. Yellow Cab Co.*, 73 Ill. 2d 113, 123 (1978). "In this regard, it has been said that the liability of the master and servant for the acts of the servant is deemed that of one tortfeasor and is a consolidated or unified one." *Towns*, 73 Ill. 2d at 124. Therefore, the claims asserted are one and the same. *Towns*, 73 Ill. 2d at 124.

Here, it is undisputed that the liability of the Hospital is predicated, at least in part, on the alleged acts of its covered employees, including Dr. Baldoceda. Where they are unified tortfeasors, and CHRPP has a contractual obligation to defend the Hospital, the only reasonable interpretation of the language of section 5.7 means that

CHRPP cannot discharge its duty to "defend any suit against the Hospital" without also defending the suit against its covered employee. Accordingly, CHRPP owed Dr. Baldoceda a duty to defend him in the *Rivera* action.

■ We next consider whether there was a valid target tender to CHRPP. The target tender rule provides an insured covered by multiple concurrent policies with the paramount right to choose which insurer will defend and indemnify it with respect to a specific claim. *Kajima Construction Co. v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102, 107 (2007); *John Burns Construction Co. v. Indiana Insurance Co.*, 189 Ill. 2d 570, 574 (2000). The insured's right to choose also encompasses the right to deactivate coverage with an insurer previously selected for purposes of invoking exclusive coverage with another insurer. *Alcan United, Inc. v. West Bend Mutual Insurance Co.*, 303 Ill. App. 3d 72, 83 (1999) (cited with approval in *Kajima*, 227 Ill. 2d at 110); see also *Richard Marker Associates v. Pekin Insurance Co.*, 318 Ill. App. 3d 1137, 1143 (2001) (insured's right to deactivate coverage was not relinquished by the settlement of the underlying claim). An insured may forego an insurer's assistance on a particular claim for various reasons, including fear of increased premiums or cancellation of the policy in the future. *Cincinnati Cos. v. West American Insurance Co.*, 183 Ill. 2d 317, 326 (1998).

When an insured has knowingly chosen to forego one insurer's assistance by instructing that insurer not to involve itself in the litigation, the targeted insurer then has the sole responsibility to defend and indemnify the insured up to the limits of its liability and is thereby foreclosed from seeking equitable contribution from the other insurer that was not designated by the insured. *Kajima*, 227 Ill. 2d at 108; *Burns*, 189 Ill. 2d at 574. However, in keeping with the doctrine of horizontal exhaustion, to the extent that defense and indemnity costs exceed the primary limits of the targeted insurer, the deselected insurer or insurers' primary policy must answer for the loss before the insured can seek coverage under an excess policy. *Kajima*, 227 Ill. 2d at 117.

With these principles in mind, we consider whether there was an effective target tender in the present case. The record reveals that ISMIE agreed to provide Dr. Baldoceda with a defense in the *Rivera* action. CHRPP took the position that its coverage was excess based upon its interpretation of its "other insurance" clause and, therefore, Dr. Baldoceda should look to ISMIE for primary coverage. However, by August 1994, in the *Padilla* case, it had been determined that CHRPP and ISMIE provided concurrent primary coverage. By letter dated December 13, 1996, Dr. Baldoceda wrote to the chief executive officer of Norwegian and made the following statements:

"Nothwithstanding my ISMIE coverage, I look to [Norwegian], and its insurer, to provide me with my primary and excess layer of malpractice coverage for this occurrence. Furthermore, I request at this juncture, that the Hospital provide me with legal representation by the Hospital's defense counsel \*\*\*. It is my understanding that Illinois law permits me to make the above election as to which available insurance policy is to be treated as my primary coverage."

Concurrently, on December 23, 1996, Dr. Baldoceda's counsel through ISMIE wrote a letter to the Hospital's counsel and stated in pertinent part as follows:

"Dr. Baldoceda has recently decided that he wants to have [Norwegian] insure and indemnify his conduct in this malpractice suit under its primary and excess insurance through CHRPP. It is Dr. Baldoceda's wish to have his [ISMIE] coverage remain secondary; the [ISMIE] policy would be used only in the event that there was insufficient CHRPP coverage (primary and excess) to cover this entire loss. As such, he has also requested at this juncture that his defense be tendered to the Hospital and CHRPP, such that your law firm would now defend his interests for the balance of this litigation."

The letter further provided that "in support of his decision electing to have [Norwegian's] CHRPP coverage, in lieu of his [ISMIE] policy, act as his first line of insurance coverage applicable to this occurrence, Dr. Baldoceda is relying upon current Illinois law," including the case of *Institute of London Underwriters v. Hartford Fire Insurance Co.*, 234 Ill. App. 3d 70 (1992). These letters were both forwarded to CHRPP.

Thereafter, Dr. Baldoceda filed a declaratory judgment action in part seeking the court to declare that CHRPP owed him a duty to defend and indemnify and that he had sought exclusive coverage from CHRPP. During the pendency of the action, the underlying litigation subsequently settled, and Dr. Baldoceda withdrew his declaratory judgment action.

CHRPP does not contest the right of an insured to deactivate coverage, but maintains that Dr. Baldoceda did not sufficiently renounce his coverage with ISMIE to show that he was looking exclusively to CHRPP to defend and indemnify him. CHRPP argues that Dr. Baldoceda was merely attempting to reprioritize his coverage by indicating that he desired to have his ISMIE coverage "remain secondary" and by stating that his ISMIE coverage would pay only if there was insufficient coverage under both the CHRPP primary and excess trust agreements. In support, it cites *John Burns*, 189 Ill. 2d at 574, and *Dearborn Insurance Co. v. International Surplus Lines Insurance Co.*, 308 Ill. App. 3d 368 (1999).

In *John Burns*, the court found an effective tender where the insured's letter indicated that it "looked solely" to the targeted insurer for defense and indemnification. *John Burns*, 189 Ill. 2d at 574. In *Dearborn*, the letter from the insured indicated as follows:

> " 'Therefore, at this time, it's probably best that you accept this as a possible claim but not something in which you need to take an active role unless, of course, your claims people disagree. In this regard, I await your feedback.' " *Dearborn*, 308 Ill. App. 3d at 371.

The court held that this letter gave the insurer actual notice of the claim and did not effectively deactivate coverage because the insured gave the insurer no specific direction not to defend but, rather, left the determination as to whether to become involved in the litigation up to the insurer. *Dearborn*, 308 Ill. App. 3d at 374.

■ Here, Dr. Baldoceda's letter unequivocally manifested his intent to forego assistance from ISMIE and have CHRPP defend and indemnify him for the loss. A target tender is not negated merely by an expressed desire to keep the deactivated insurer on notice as standby coverage in the event that the selected insurer refuses the tender (*Legion Insurance Co. v. Empire Fire & Marine Insurance Co.*, 354 Ill. App. 3d 699, 706 (2004) (deselected insurer required to provide standby coverage where selected insurer refused tender)), or in the event that the selected primary coverage has been exhausted (*Kajima*, 227 Ill. 2d at 117).

Furthermore, to the extent that CHRPP argues that Dr. Baldoceda had to renounce or completely abandon his coverage under his ISMIE policy based upon our holding in *CHRPP I*, that is not what the law requires. CHRPP has read the holding in *CHRPP I* too broadly. In *CHRPP I*, there was no indication that the Excess Trust had been implicated with respect to Dr. Baldoceda. Therefore, the term "renounce" in that context could only have meant to forego his primary coverage with ISMIE in relation to his concurrent primary coverage with CHRPP.

However, to the extent that Dr. Baldoceda's target tender sought a vertical exhaustion of both CHRPP primary and excess coverage before ISMIE would be held answerable for the loss, it was an ineffective target tender of the Excess Trust. As *Kajima* explains, there must be horizontal exhaustion of all primary coverage before the excess layer of coverage would be implicated. *Kajima*, 227 Ill. 2d at 117.

Thus, once Dr. Baldoceda exclusively sought coverage from CHRPP, CHRPP had the sole responsibility to defend and indemnify him. ISMIE's duty was to provide standby coverage in the event CHRPP refused to defend, and it was relieved of its obligation to defend and indemnify for the loss to the extent that the defense and indemnity

costs did not exceed the limits of CHRPP's primary limits of liability. *Legion*, 354 Ill. App. 3d at 706; *Kajima*, 227 Ill. 2d at 117. Accordingly, since ISMIE's duty to defend and indemnify was excused by the exclusive tender, and CHRPP wrongfully refused the tender, the trial court erred in awarding ISMIE summary judgment on only half of its expenses.

For all of the foregoing reasons, we reverse the circuit court's grant of summary judgment on CHRPP's equitable subrogation claim, reverse the court's grant of summary judgment on ISMIE's counterclaim to the extent that it only awarded half of its defense costs, and remand for further proceedings consistent with this opinion.

Reversed and remanded.

HOFFMAN and KARNEZIS, JJ., concur.