American Family Mutual Insurance
Company, appellee, v. Regent
Insurance Company, appellant.
___ N.W.2d ___

Filed May 2, 2014.    No. S-13-297.

1.  **Equity: Appeal and Error.** On appeal from an equity action, an appellate court
    tries factual questions de novo on the record and, as to questions of both fact and
    law, is obligated to reach a conclusion independent of the conclusion reached by
    the trial court.
2.  **Insurance: Contracts: Appeal and Error.** The interpretation of an insurance
    policy presents a question of law that an appellate court decides independently of
    the trial court.
3.  **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an
    appellate court views the evidence in a light most favorable to the party against
    whom the judgment was granted and gives that party the benefit of all reasonable
    inferences deducible from the evidence.
4.  ____: ____. An appellate court will affirm a lower court's grant of summary
    judgment if the pleadings and admitted evidence show that there is no genuine
    issue as to any material facts or as to the ultimate inferences that may be drawn
    from the facts and that the moving party is entitled to judgment as a matter
    of law.
5.  **Contribution: Equity.** Contribution is an equitable remedy given to the party
    who pays a debt that is concurrently owed by another party. The existence of a
    "common obligation" makes the right to contribution possible.
6.  **Insurance: Contribution.** Among insurers, the right to contribution arises in two
    basic circumstances: (1) An insurer of a joint tort-feasor has paid all, or greater
    than its share, of a loss, and (2) a single insured is covered by concurrent or
    "double" insurance, and one insurer paid all, or greater than its share, of a loss.
7.  ____: ____. In the circumstance of concurrent insurers, contribution is proper
    only where the policies insure the same entities, the same interest in the same
    property, and the same risk.
8.  **Insurance: Contracts: Contribution.** When considering whether insurance poli-
    cies cover the "same risk," it is not necessary that the policies provide identical
    coverage in all respects. As long as the particular risk actually involved in the
    case is covered by both policies, the coverage is concurrent, and contribution will
    be allowed.
9.  ____: ____: ____. In determining whether one insurer is entitled to contribu-
    tion from another, courts consider the nature of the claim, the relation of the
    insured to the insurers, the particulars of each policy and any other equitable
    considerations.
10. **Insurance: Liability.** The insurer seeking indemnification against a concurrent
    insurer does so entirely in its own right.
11. **Insurance: Contribution: Words and Phrases.** Contribution in a concurrent
    insurer scenario is a right of the insurer flowing from equitable principles
    designed to accomplish ultimate justice in the bearing of a specific burden.

12. **Insurance: Contribution: Proof.** A contribution rule based on apportionment of fault would hamper settlements and require the defendant to prove its own fault before the defendant's insurer could seek equitable contribution.

13. **Contribution.** For coverage to be concurrent for purposes of contribution, it must be at the same level—primary to primary or excess to excess.

14. **Insurance: Liability.** The loss between the primary insurers should be apportioned before considering the excess insurers' exposure.

15. **Insurance: Contracts.** Among policies at the same level, absent compelling equitable reasons, courts should not impose an obligation on an insurer that contravenes a provision in its insurance policy.

16. **Insurance: Contracts: Words and Phrases.** A true excess insurance policy is one providing coverage conditioned upon the existence of a primary policy, which coverage does not begin until a loss exceeds a stated level.

17. **Insurance: Contracts: Liability.** Umbrella policies, as the only true excess insurance policies, incur liability only after the exhaustion of all other policies, including primary policies containing excess insurance clauses.

18. ____: ____: ____. Where an excess clause and a pro rata clause appear in concurrently effective policies, the pro rata clause is usually disregarded and full effect is given to the excess clause, making the pro rata policy the primary insurance.

19. ____: ____: ____. Excess insurance clauses are mutually repugnant, and the liability should be shared by the insurers pro rata in the proportion that their respective policy limits bear to the entire loss.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Affirmed.

Mark C. Laughlin and Patrick S. Cooper, of Fraser Stryker, P.C., L.L.O., and Brian D. Nolan and Michael D. Reisbig, of Nolan, Olson, & Stryker, P.C., L.L.O., for appellant.

Joel D. Nelson and Joel A. Bacon, of Keating, O'Gara, Nedved & Peter, P.C., L.L.O., for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, STEPHAN, McCORMACK, MILLER-LERMAN, and CASSEL, JJ.

McCORMACK, J.

## I. NATURE OF CASE

This is an action for contribution against an insurer to pay a share of a settlement paid by another insurer to an injured guest of a party at an apartment complex. The underlying lawsuit was brought against both the ownership of the complex and its management under theories of joint and several liability. The insurer seeking contribution held liability policies

covering both the complex's ownership and management. The insurer being sued for contribution held liability policies covering the management company; the parties dispute whether the policies also covered the "same risk" for the ownership as an additional insured. The insurer seeking contribution argues that it does not matter whether both tort-feasors were coinsureds under all the policies at issue because, either way, the insurers shared a "common obligation."

## II. BACKGROUND

This contribution action stems from a lawsuit to recover for injuries sustained when a guest at an apartment complex fell off a third-story apartment's balcony. Beacon Hill Investment Group (Beacon Hill) owned the apartment complex, and N.P. Dodge Management Company (NP Dodge) managed it.

### 1. Accident

When the decks of the apartment complex were built in 1968, there was no code specifying the minimum height for deck railings. The decks of the complex were remodeled in 1997. This improvement was apparently at the behest of NP Dodge.

According to a representative of Beacon Hill, it was NP Dodge's job to ensure that its properties met safety codes. A representative of NP Dodge generally agreed it was NP Dodge's responsibility to keep the property compliant with current safety codes.

The plans submitted for the permit specified that the old deck railing would be reused, but incorrectly indicated that those deck railings were 36 inches high. In fact, the railings were 30 inches high. The applicable 1994 Uniform Building Code required guardrails within private apartments to be a minimum of 36 inches high. The 1994 Uniform Building Code required most other exterior guardrails to be 42 inches high.

In 2003, NP Dodge's assistant property manager lived in a third-floor apartment at the complex. While off duty, she had a small gathering of her friends at her apartment. There

was underage drinking at the gathering, although the assistant property manager stated she did not provide any guests with alcohol.

A neighboring tenant and his friend, the guest, stopped by. The guest went out to the apartment's balcony to smoke. He was 20 years old and very intoxicated. He fell over the railing. Injuries from the fall rendered the guest a quadriplegic.

The guest sued both Beacon Hill and NP Dodge. The complaint alleged that Beacon Hill and NP Dodge were jointly and severally liable for his injuries under theories of premises liability and negligence relating to the dangerous condition of the low railing. The guest also alleged that NP Dodge's assistant property manager was negligent in allowing alcohol to be served to minors and in failing to warn the guest of the low railing height.

## 2. Management Agreement

NP Dodge has been managing the Beacon Hill property since 1986. The management agreement in force at the time of the accident provided that Beacon Hill was to obtain and keep in force adequate insurance "against liability for loss, damage, or injury to property or persons which might arise out of the occupancy, management, operation or maintenance of the Property." Beacon Hill was to cover NP Dodge "as an additional insured on all liability insurance maintained with respect to the Property." For its part, NP Dodge was required by the management agreement to, at all times, maintain "general liability, automobile liability, and worker's compensation insurance on [NP Dodge's] employees." And NP Dodge was to cover Beacon Hill as an "additional insured on [NP Dodge's] general liability policy."

A "Liability and Hold Harmless" provision contained in a 2001 amendment to the management agreement stated in relevant part:

> To the extent not covered by applicable policies of insurance, [Beacon Hill] shall hold harmless and reimburse [NP Dodge] for expenses incurred by [NP Dodge], including . . . claims for personal injury and property

> damage, reasonable costs and attorney fees, and any liability, fines or penalties, in connection with any claim, proceedings, or suit involving an alleged violation by [NP Dodge] or [Beacon Hill], or both, of any law or duty with respect to any alleged violations of local, federal or state laws occurring after the effective date of this Agreement . . . provided, however, that [Beacon Hill] shall not be responsible to [NP Dodge] for any such expenses in the event the liability . . . is the result of a willful violation by [NP Dodge], or its employees, of any local, federal, or State laws or regulations (unless [NP Dodge] was not the cause of the violation and has used its best efforts to remedy the violation), or is the result of the willful misconduct or the negligent act or omission of [NP Dodge] or the agents or employees of [NP Dodge] or for any acts of [NP Dodge] arising outside of the scope of this Agreement.

Likewise, NP Dodge agreed to hold harmless and reimburse Beacon Hill

> for any loss [Beacon Hill] incurs as a result of a willful violation by [NP Dodge], or its employees, of any local, federal, or State laws or regulations (unless [NP Dodge] was not the cause of the violation and has used its best efforts to remedy the violation), or is the result of the willful misconduct or the negligent act or omission of [NP Dodge] or the agents or employees of [NP Dodge] and for any acts of [NP Dodge] arising outside of the scope of this Agreement.

### 3. Insurance Policies

American Family Mutual Insurance Company (American Family) insured Beacon Hill as its named insured, and Regent Insurance Company (Regent) insured NP Dodge as its named insured. Pursuant to the management agreement, Beacon Hill was an additional insured under Regent's policies for NP Dodge and NP Dodge was an additional insured under American Family's policies for Beacon Hill.

### (a) American Family
### Primary Policy

American Family provided a primary "Businessowners Package Policy" for Beacon Hill as the named insured in the amount of $1 million per occurrence. The coverage included bodily injury liability. The annual premium was $37,006. The policy included as an "insured" "any organization, while acting as [Beacon Hill's] real estate manager."

The "**Other Insurance**" provision of the American Family primary policy provided that the insurance was primary except with respect to certain fire, watercraft, and other insurance coverage, which are not applicable here. The obligations under the American Family primary policy were "not affected [by other insurance] unless any of the other insurance is also primary." In the event there was coverage for the loss with another primary policy, then the other insurance clause provided:

> If all of the other insurance permits contribution by equal shares, **we** will follow this method also. Under this approach each insurer contributes equal amounts until each has paid its applicable limit of insurance or none of the loss remains, whichever comes first.
>
> If any of the other insurance does not permit contribution by equal shares, **we** will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limit of insurance to the total applicable limits of insurance of all insurers.

### (b) American Family
### Umbrella Policy

American Family provided an umbrella policy in the amount of $5 million for Beacon Hill as the named insured. The annual premium for the umbrella coverage was $5,714.

NP Dodge was an additional insured under the umbrella policy pursuant to a provision that the policy would cover any person "(other than **your** employee) or any organization while acting as **your** real estate manager."

The "**Other Insurance**" clause of the umbrella policy stated:

If other valid and collectible insurance is available to the **insured** for **ultimate net loss we** cover under this policy, [American Family's] obligations under this policy are limited as follows:

a. As this insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis, except such insurance as is specifically purchased to apply in excess of this policy's Limit of Insurance, **we** will indemnify only **our** share of the amount of **ultimate net loss**, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance . . . .

(c) Regent Primary Policy

Regent provided a primary comprehensive insurance policy for NP Dodge as the named insured. The policy included general liability coverage in the amount of $1 million per occurrence. The premium for this policy was $144,403 annually.

A "Blanket Additional Insured Endorsement" for the Regent primary policy defined as an additional insured "[a]ny person or organization whom you are required to add as an additional insured on this policy under a written contract or agreement . . . ."

The endorsement provided that such "person or organization is only an insured with respect to liability arising out of premises you [NP Dodge] own, rent, lease or occupy; or 'your work' for that additional insured by or for you [NP Dodge]." The policy elsewhere defines "Your work":

**a.** Means:

**(1)** Work or operations performed by you [NP Dodge] or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

**(2)** The providing of or failure to provide warnings or instructions.

The blanket additional insured endorsement further stated that the insurance for such person or organization does not apply to:

"bodily injury" . . . arising out of an architect's, engineer's or surveyor's rendering or failing to render any professional services including:

**1.** The preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, design or specifications; or

**2.** Supervisory, inspection or engineering services.

As to the named insured under the policy, the "**Other Insurance**" section of Regent's primary policy was similar in most respects to the other insurance provision of American Family's primary policy:

**a. Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**

This insurance is excess over:

**(1)** [Fire coverage, watercraft coverage, et cetera]

. . . .

**(2)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

. . . .

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under

this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

But as to an additional insured under the blanket additional insured endorsement, the other insurance provision of Regent's primary policy stated: "Any coverage provided hereunder shall be excess over any other valid and collectible insurance available to that person or organization whether primary, excess, contingent or on any other basis unless a contract specifically requires that this insurance be primary."

### (d) Regent Umbrella Policy

Regent provided a commercial umbrella policy in the amount of $4 million for NP Dodge as the named insured. The premium for this policy was $22,522 annually.

The umbrella policy covered "[a]ny person or organization who is an additional insured in the 'underlying insurance,'" with the caveat that "[t]he coverage afforded under this insurance will be no broader than that of the 'underlying insurance.'"

Similarly to Beacon Hill's umbrella policy, the other insurance clause of Regent's umbrella policy stated, as to both its named and additional insureds, that it was "excess over any of the other insurance" and will pay only its "share" of the amount of the loss that exceeds the sum of the "total amount that all such other insurance would pay for the loss in the absence of this insurance" and the total of all deductible and self-insured amounts under all other insurance.

### 4. CLAIMS ADJUSTER
#### COMMUNICATIONS

American Family hired an attorney to represent the interests of both Beacon Hill and NP Dodge in the guest's suit against them. American Family's litigation attorney filed an answer to the guest's complaint, generally denying liability on the part of Beacon Hill or NP Dodge and alleging contributory negligence to a degree sufficient to bar his recovery.

American Family's claims analyst wrote to Regent requesting that it share in the costs of the litigation attorney's

representation. The analyst explained that "it appears that both our policies have primary coverage." Therefore, "each insurer is to contribute in equal amounts until each has paid its applicable limit of insurance or none of the loss remains, which ever [sic] comes first."

In consideration of this letter, Regent suggested in its internal communications that "[d]ifferent court's [sic] might reach different results" but that NP Dodge could "make the argument" that "the fact of insurance coverage for [NP] Dodge is beside the point," because the claim did not "fall within those defined by the [liability and hold harmless] paragraph." Furthermore, the agreement required Beacon Hill to "have coverage for injury to property or persons arising out of the occupancy of the Property and is to name [NP Dodge] as an additional insured," but NP Dodge "has no similar requirement." Therefore, it could be argued that "[t]he fact that [NP] Dodge has coverage under a [Regent] Policy at a cost that it incurred for any lapse of other protection does not make such coverage applicable to this cause except as 'excess' for [NP] Dodge."

On October 30, 2006, Regent sent a letter to American Family advising that "at this time, we are unable to agree with your assessment regarding sharing in the defense of this matter and contributing one-half of the legal fees incurred by American Family." The October 30 letter "direct[ed] [American Family's] attention" to the hold harmless provisions of the management agreement and asserted that under this agreement, Beacon Hill must "defend and hold harmless [NP] Dodge." Regent asserted that "the fact that [NP] Dodge has insurance coverage is moot to the argument." Regent further stated:

> Paragraph 5 on page 3 [of the management agreement] clearly provides that the owner is to have coverage for injury to property or persons arising out of the occupancy of the property and is to name the agent as an additional insured. [NP] Dodge has no similar requirement. The fact that [NP] Dodge has coverage under a [Regent] policy at a cost that it incurred for any lapse of other protection does not make such coverage applicable to this loss except as "excess" coverage for [NP] Dodge.

American Family's claims analyst responded in a letter dated December 18, 2006:

> This letter is in response to your correspondence of October 30, 2006, in which you enclosed a copy of the Management Agreement between Beacon Hill . . . and [NP Dodge] and Amendment. I did not previously have that agreement. Based upon my review of that agreement and the policies, I do concur with your assessment regarding American Family's primary coverage of [NP Dodge].
>
> By copy of this correspondence to [other parties involved], I want to reiterate that at no time did American Family ever suggest that [NP Dodge] was not entitled to defense and indemnification under the American Family policy. Rather, I was simply investigating if there were other policies under which [NP Dodge] would also be owed primary coverage in this matter.

For a period of time, there were no further communications between American Family and Regent discussing the priority of coverage under their respective policies. Regent assumed that both its primary and umbrella policies would be excess to both the primary and umbrella coverage provided for in American Family's policies. Because Regent estimated the value of the underlying action to be less than the $6 million combined amount of coverage through American Family, it did not think it would ever be liable for a payout.

Regent hired its own litigation attorney to represent the interests of NP Dodge and to keep Regent informed of the underlying litigation. Regent instructed the attorney to "only monitor the litigation, and to not actively participate in the defense of my insured NP Dodge." According to Regent's claims analyst, had he known that American Family was not "providing a full defense and indemnification to my insured, NP Dodge," he would have instructed the litigation attorney to "take different action in the underlying litigation, including the filing of a cross-claim against Beacon Hill for indemnification pursuant to the property Management Agreement."

American Family's litigation attorney generally kept Regent's litigation attorney abreast of the matters pertaining to

the underlying lawsuit by the guest. At no point did American Family discourage Regent's more direct involvement. American Family's litigation attorney provided Regent's litigation attorney with hard copies of all the depositions taken during discovery. American Family's litigation attorney also provided Regent's litigation attorney with copies of motions filed and court orders in the case. Regent has no complaints regarding the performance of American Family's litigation attorney in the underlying action.

American Family's litigation attorney sought partial summary judgment on the issue of whether NP Dodge's assistant property manager was acting within the scope of her employment at the time of the fall. That motion was overruled on August 28, 2008. Another motion for summary judgment brought on behalf of both Beacon Hill and NP Dodge was overruled on April 2, 2009. In its April 2 order, the court directed the parties to submit to mediation on or before June 1. American Family's litigation attorney apprised Regent's litigation attorney of these matters in a letter dated April 3, 2009.

On April 21, 2009, Regent sent a letter to American Family noting an upcoming scheduled mediation for May 2, "as a courtesy to remind American Family of its duties to our insured, NP Dodge . . . , as an additional insured on the American Family Policy." The letter also took "this opportunity to remind you of the duties owed to [Regent] as the excess carrier in this matter." Finally, Regent stated:

> It is our understanding that American Family maintains a $1 million underlying policy with a $5 million umbrella, providing total available coverage of $6 million. It is our position that this case has a settlement value within those policy limits and that our insured and [Regent] should not be exposed to any excess exposure.

On May 1, 2009, American Family sent a fax in response to Regent's letter, which American Family said it had not received until April 28. American Family stated:

> While we agree with your assertion that we owe a duty to both Beacon Hill and NP Dodge to act in good faith in handling this claim we also assert that you owe the

same duty to your insured. Based on your good faith obligation to your insured, we believe it is imperative that a representative of [Regent] appear at the mediation on May 2, 2009.

American Family further stated in the May 1, 2009, fax:

As expressed in an earlier communication, American Family's coverage under the Business Owner Package Policy (BOPP) policy [sic] is the primary insurance for Beacon Hill and NP Dodge. Contrary to your statement in your letter dated April 21, 2009, the [Regent] commercial liability policy . . . is also a primary policy.

Setting forth various policy provisions, American Family explained it did "not agree with your assertion that American Family has $6 Million in coverage before the [Regent] policies." American Family stated its position that its $1 million primary policy was first, then Regent's primary policy, then both umbrella policies on a pro rata basis.

Regent did not participate in the mediation. During the mediation, American Family's litigation attorney reached a tentative settlement with the guest. The settlement was signed on June 10, 2009. It released all liability for Beacon Hill, NP Dodge, American Family, and Regent in exchange for an initial payment of $2 million and monthly payments of $4,375.20 for 25 years. American Family reserved any rights of contribution against Regent. American Family, pursuant to the settlement, paid the guest $3.5 million. Regent has not paid anything toward the settlement. Regent concedes that the settlement was fair and reasonable.

## 5. Current Suit for Contribution

American Family sued Regent for equitable contribution toward the payment it made to the guest under the settlement agreement. American Family's complaint alleged that "American Family's and Regent's liability and excess/umbrella coverages applied to at least one of the two defendants in the personal injury case (Beacon Hill and [NP] Dodge), applied to the same risk and loss, and applied to the same potential liability and exposure." The complaint further alleged that

American Family had borne more than its share of the "common obligation" from Regent. American Family asked for reimbursement of $1 million plus four-ninths of the cost of future monthly payments under the settlement.

In Regent's answer, it generally denied the allegations and affirmatively asserted the defense of estoppel, lack of privity, waiver, and unjust enrichment. American Family and Regent filed cross-motions for summary judgment.

American Family asserted in its motion for summary judgment that, as a matter of law, Regent's primary and umbrella coverages applied to the underlying injury claims and that no policy provision or other agreement negated Regent's obligation to pay damages under those coverages. At the hearings on the motions for summary judgment, American Family elaborated that both companies' insurance policies insured the same risk and the same loss.

Regent's motion for summary judgment generically asserted that there was no material issue of fact preventing summary judgment in its favor. At the hearing on the motions, Regent argued that American Family's claims analyst conceded in the December 18, 2006, letter that both American Family's primary policy and its umbrella policy were in "first position" before either of Regent's policies. Regent argued that the May 1, 2009, fax came too late to retract this concession and that American Family was equitably estopped from seeking contribution. In the event equitable estoppel did not apply, Regent argued:

> They settle it on their nickle [sic], and this is an attempt to try to essentially subrogate in a way that's not permitted under the Royal case we cite in our brief, to recover monies they chose to pay to settle the case where they are responsible for getting it resolved within their limits, if they can, on a primary basis, both of their policies; primary with respect to ours.

The district court granted summary judgment in favor of American Family. In its order, the court set forth Regent's defense as arguing that (1) a direct action against Regent is not allowed under Nebraska law and (2) equitable estoppel bars American Family's claim.

The court concluded that a direct action for contribution was proper. The court distinguished *Royal Ind. Co. v. Aetna Cas. & Sur. Co.*,[1] in which we held that lack of privity barred one joint tort-feasor's insurer's contribution action against the other tort-feasor's insurer, but not the insurer's action against the tort-feasor. The district court explained that American Family presented a case where the insurers shared a joint insured and both provided coverage for the accident in question. The court explained that one insurer can seek contribution from another when both policies insured the same risk. The court explained that insuring the same risk does not require that each insurer provided coverage to all the same policyholders.

The court rejected any argument that the management agreement overrode the respective insurance policies regarding priority of payment.

The court also rejected Regent's estoppel argument. The court found that there was no evidence from which a fact finder could conclude that any American Family representative misrepresented a material fact, as opposed to expressing a mere opinion. The court said that any statements by American Family about paying for NP Dodge's defense were irrelevant, because American Family did not seek contribution on defense costs. In any event, there was no evidence that American Family's claims analyst had the authority to change the terms of the policies. Finally, the court found no evidence that Regent had changed its position or proposed course of action in reliance on any representations by American Family.

The court then concluded that American Family had paid more than its pro rata share of a joint obligation:

> Each insurer . . . had $ 1 million in primary liability coverage. Above that, American Family had $ 5 million in excess coverage and Regent $ 4 million in excess coverage. Whether viewed as concurrent obligations to pay under their primary liability coverages, or that American

---

[1] *Royal Ind. Co. v. Aetna Cas. & Sur. Co.*, 193 Neb. 752, 229 N.W.2d 183 (1975).

Family would pay under its primary liability coverage and then Regent under its, each insurer owed $ 1 million initially. That accounts for $ 2 million of the $ 3.5 million settlement amount. For the remaining $ 1.5 million, each insurer owed "our share" pursuant to the umbrella/excess coverage language of the policies. That means five-ninths of the obligation be borne by American Family and four-ninths by Regent.

Accordingly, the court entered judgment in favor of American Family in the amount of $1,666,666. The court overruled Regent's motion to reconsider, alter, or amend the order. Regent appeals.

## III. ASSIGNMENTS OF ERROR

Regent assigns that the district court erred in granting summary judgment in favor of American Family and in denying summary judgment in favor of Regent.

## IV. STANDARD OF REVIEW

[1] On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court.[2]

[2] The interpretation of an insurance policy presents a question of law that we decide independently of the trial court.[3]

[3] In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.[4]

[4] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or

---

[2] *Gibbs Cattle Co. v. Bixler*, 285 Neb. 952, 831 N.W.2d 696 (2013).

[3] *Federated Serv. Ins. Co. v. Alliance Constr.*, 282 Neb. 638, 805 N.W.2d 468 (2011).

[4] *McKinney v. Okoye*, 287 Neb. 261, 842 N.W.2d 581 (2014).

as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[5]

## V. ANALYSIS

[5,6] Contribution is an equitable remedy given to the party who pays a debt that is concurrently owed by another party.[6] The existence of a "common obligation" makes the right to contribution possible.[7] Among insurers, the right to contribution arises in two basic circumstances: (1) An insurer of a joint tort-feasor has paid all, or greater than its share, of a loss, and (2) a single insured is covered by concurrent or "double" insurance, and one insurer paid all, or greater than its share, of a loss.[8]

[7,8] In the second circumstance, that of concurrent insurers, it is said that contribution is proper only where the policies insure the same entities, the same interest in the same property, and the same risk.[9] When considering whether insurance policies cover the "same risk," it is not necessary that the policies provide identical coverage in all respects.[10] As long as the particular risk actually involved in the case is covered by both policies, the coverage is concurrent, and contribution will be allowed.[11]

These basic principles of contribution among insurers are not easily applied, however. Indeed, few areas in the field of insurance law give courts and parties more difficulty than that of duplicating or overlapping insurance.[12] Part of the

---

[5] *Peterson v. Homesite Indemnity Co.*, 287 Neb. 48, 840 N.W.2d 885 (2013).

[6] 2 Warren Freedman, Freedman's Richards on the Law of Insurance § 12:3 (6th ed. 1990).

[7] *Id.* at 337.

[8] 15 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 217:4 (2005).

[9] *Id.*, § 218:3.

[10] See *id.*, § 218:6.

[11] See *id.*

[12] See 8A John Alan Appleman & Jean Appleman, Insurance Law and Practice § 4906 (1981).

difficulty stems from the reality that a perfect commonality of obligation does not exist in the real world:

> Unfortunately, there is no uniformity as to the rules of apportionment and contribution since true concurrency of policies never does exist. It is veritably impossible for the insurance policies to relate to the same subject matter, against the same risk, for the same insured or interest, and at the identical time.[13]

[9] Moreover, because contribution lies in equity, there is no definitive rule applicable in every case in light of varying equitable considerations which may arise and which affect the insured and the primary and excess carriers.[14] Thus, in determining whether one insurer is entitled to contribution from another, courts consider the nature of the claim, the relation of the insured to the insurers, the particulars of each policy, and any other equitable considerations.

## 1. ARGUMENTS

American Family and Regent compound the inherent difficulty with legions of changing arguments as to whether they share a common obligation toward the guest's settlement, how to determine each parties' share of the loss, and whether other principles apply to bar contribution in this case. The most plentiful arguments come from Regent.

Broadly, Regent believes it should have to pay nothing toward the settlement that released Regent and its named insured, NP Dodge—which indisputably had a primary policy and an umbrella policy with Regent providing commercial general liability and bodily injury coverage. In contrast, American Family argues that its primary policy was liable for the first $1 million of the settlement with the guest, but that the second $1 million of the settlement should have been Regent's share of the obligation under Regent's primary policy and that their respective umbrella policies should have shared the last $1.5 million in future payments pro rata.

---

[13] 2 Freedman, *supra* note 6, § 12:2 at 326.

[14] *Fire Ins. Exchange v. American States Ins.*, 39 Cal. App. 4th 653, 46 Cal. Rptr. 2d 135 (1995).

### (a) Claims Adjuster
### Correspondence

But we summarize with more particularity the evolution of the parties' theories, as each party accuses the other of raising issues for the first time on appeal, and Regent asserts estoppel based on early communications between the claims adjusters. We begin with the internal and external correspondence of the claims adjusters. We find this correspondence, for the most part, vague.

It appears, especially in later communications, that Regent relied on the management agreement to support its theory that it was not liable to contribute toward any loss. Alternatively, Regent thought it was an "excess carrier." By the time of its April 21, 2009, letter, Regent clearly explained to American Family its belief that it was not liable to contribute toward any loss until the total $6 million in coverage under both the primary and umbrella policies with American Family was exhausted.

American Family, in its early correspondence, seemed to accept that under the hold harmless provision of the management agreement, American Family would not be reimbursed for legal fees incurred by its counsel in representation of Beacon Hill and NP Dodge. Beyond that, it is unclear what American Family meant when it wrote on December 18, 2006, "I do concur with your assessment regarding American Family's primary coverage of [NP Dodge]." We disagree with Regent's assessment that, through this statement, American Family "expressly agreed with and stipulated to Regent's analysis, indicating that it would treat the American Family policies, which provided $6 million in coverage, as primary coverage."[15] By the time of the May 1, 2009, fax, which was responding to Regent's April 21 letter stating clearly for the first time its position that it was not liable until $6 million was exhausted, American Family more clearly stated its belief that its primary policy was liable first, Regent's primary policy was second, then the umbrella policies would share the remaining liability on a pro rata basis.

---

[15] Brief for appellant at 23.

### (b) Arguments Before
### District Court

American Family's contribution action before the district court sought this same distribution of the shared obligation on the settlement; i.e., American Family primary, Regent primary, and American Family and Regent pro rata. The complaint alleged that the American Family and Regent policies applied to "at least one of the two defendants in the personal injury case (Beacon Hill and [NP] Dodge), applied to the same risk and loss, and applied to the same potential liability and exposure." American Family alleged it had borne more than its share of the parties' common obligation.

At the hearing on the parties' cross-motions for summary judgment, Regent no longer pressed any argument based on the management agreement. Regent instead argued that American Family's December 18, 2006, response to Regent's management agreement theory estopped American Family from claiming contribution.

Regent alternatively argued that a lack of privity barred American Family's claim. And, alternative to that, Regent argued that both American Family policies were primary to both Regent policies. Regent's underlying theory as to why its primary policy was secondary to American Family's umbrella policy is not clear from the record.

American Family apparently took the stance that sharing either one or both the same entities jointly and severally liable to the guest rendered a common obligation under the settlement. And, as far as the record reflects, this underlying legal contention was not a point of dispute. Regent did not argue that as a matter of law, contribution is improper when only one insured is common to the two insurers. In granting summary judgment for American Family, the district court explicitly reasoned that sharing the requisite common obligation does not require that each insurer provided coverage to all the same policyholders.

Although all the relevant policies were before the district court, neither party asked the court to address whether Beacon Hill, like Regent, was a coinsured under both the American Family and Regent policies for the "same risk" involved in

the guest's action. And the court's reasoning would have made such determination unnecessary. Regent has never denied that NP Dodge was a coinsured under both the American Family and Regent policies for the "same risk."

Neither Regent nor American Family asked the district court to apportion the underlying fault of Beacon Hill and NP Dodge for the guest's injuries. Only as part of its estoppel argument did Regent bemoan the fact that had it known American Family was not covering the first $6 million, it would have taken more action to differentiate NP Dodge's liability from Beacon Hill. The reason why Beacon Hill believed such apportionment of fault mattered for purposes of the contribution action was not fully clear.

The record reflects no argument by Regent that the district court should consider as the parties' common obligation only one-half of the settlement amount. And Regent did not raise before the district court any issues pertaining to Neb. Rev. Stat. § 25-21,185.10 (Reissue 2008).

### (c) Arguments on Appeal

In this appeal, Regent continues to assert estoppel, but it no longer alleges lack of privity as a defense to American Family's contribution action. Regent instead now argues that there was no common obligation as a matter of law, because the insurers did not insure all the same insureds. Regent still does not dispute that it insured NP Dodge for the same risk as NP Dodge was insured for with American Family, but it now explicitly denies such concurrent coverage of Beacon Hill.

Regent argues that there can be no contribution based on the joint and several liability of separate insureds with separate insurers. Alternatively, if there could be contribution based on joint and several liability, Regent argues that under § 25-21,185.10, NP Dodge, and thus Regent, would be jointly and severally liable only for economic damages, but not noneconomic damages. Therefore, according to Regent, no apportionment could be proper without allocation of fault and allocation of economic versus noneconomic damages. Furthermore, Regent argues that there can be no joint and

several liability if there is no liability and that "such liability was never determined in the underlying litigation."[16]

Regent argues further that if American Family and Regent are concurrent insurers or otherwise liable in contribution because they insure a joint tort-feasor, then only that share of the total damages attributable to the fault of NP Dodge is the common obligation for which it would owe contribution. Since American Family failed to present evidence upon which the district court could have allocated the respective fault of Beacon Hill and NP Dodge, Regent argues the court should have granted summary judgment in Regent's favor. At the very least, Regent asks that we remand for an allocation of fault or that we apportion liability upon only one-half of the total settlement amount. Regent argues that the district court's order "forced Regent to pay part of Beacon Hill's share of the liability, even though Regent did not insure Beacon Hill."[17]

In response, American Family continues to assert that the commonality of one insured—especially in the case of joint and several liability with the other insured—satisfies the common obligation element of contribution. American Family alternatively asserts that Beacon Hill is, in fact, a coinsured under all the policies at issue. American Family argues that fault is normally not the appropriate measure of apportionment of the common obligation; rather, one looks primarily to the policies to evaluate the extent of the respective insurer's obligations. American Family gives numerous reasons why it believes there is no merit to Regent's estoppel argument.

Regent argues in its reply brief that we cannot consider whether Beacon Hill was concurrently insured by both American Family and Regent, because American Family did not argue that point before the district court. We ordered supplemental briefing on the issue of whether Beacon Hill was a coinsured under all policies. This spurred an astounding number of new arguments regarding Regent's coverage of Beacon Hill.

---

[16] *Id*. at 16.

[17] Reply brief for appellant at 1.

To summarize these arguments, Regent asserts that Beacon Hill was not insured under its umbrella policy, because there was no "additional insured endorsement" in that policy. As to its primary policy, Regent argues that Beacon Hill is covered only for claims arising out of NP Dodge's work on premises NP Dodge owns, rents, leases, or occupies. Therefore, Beacon Hill was not covered for the "same risk" as its coverage with American Family. Furthermore, Regent points to the coverage limitations in the additional insured endorsement and argues that NP Dodge did not own, rent, lease, or occupy the Beacon Hill premises and that the accident did not arise out of NP Dodge's work. Regent further asserts that Beacon Hill was not covered under the Regent policy for the "same risk," because the additional insured endorsement stated that the primary policy's coverage of the additional insured was "excess." Finally, Regent argues that the professional services exclusion applies to bar all coverage of Beacon Hill for the guest's accident. American Family makes several arguments denying these claims and explaining why it believes that Beacon Hill is a coinsured for the same risk under both Regent's and American Family's primary and umbrella policies.

We find that the decisive issues in this case may be determined as a matter of law. Therefore, summary judgment was appropriate. For the reasons further described below, we affirm the district court's determination that contribution can be had between these two insurers who share a common insured. We find that the specific allocation of that shared obligation is a matter of equity, and in our de novo review of that determination, we agree with the district court's division based on the other insurance provisions of the respective policies. Viewing the record in a light most favorable to Regent, we find no dispute of fact that would change those conclusions.

### 2. Subrogation Issues for Joint Tort-Feasors Versus Joint Insureds

Regent is correct that some contribution cases under the first kind of contribution, on the basis of joint tort-feasor liability,

apply subrogation principles.[18] Sometimes called "reimbursement by subrogation" actions,[19] apportionment in such joint tort-feasor contribution actions may be dependent upon the tort-feasors' respective fault.[20] Other questions as well, such as the ability to directly sue the tort-feasor's insurer[21] or the applicability of a joint tort-feasor statute, may arise.[22]

Such joint tort-feasor contribution actions are rare. We note that in at least one case where contribution was based solely on the joint and several liability of separate insurers, the court apportioned the loss in the same manner as would be done between concurrent insurers, dispensing with any explicit apportionment of fault or other subrogation-type issues.[23]

[10] The right of equitable contribution under the second circumstance—between concurrent insurers—is not in any way based on principles of subrogation to the rights of the insured against the party legally responsible.[24] The insurer seeking indemnification against a concurrent insurer does so entirely in its own right.[25]

[11] The inquiry between concurrent insurers is simply whether, under its policy with the insured, the nonparticipating

---

[18] *U. S. Fire Ins. v. State Farm Ins.*, 246 Ark. 1269, 441 S.W.2d 787 (1969); *Reliance v. General Star Indem. Co.*, 72 Cal. App. 4th 1063, 85 Cal. Rptr. 2d 627 (1999); 2 Allan D. Windt, Insurance Claims & Disputes: Representation of Insurance Companies and Insureds § 7:1 (6th ed. 2013).

[19] *Reliance v. General Star Indem. Co., supra* note 18.

[20] See, *Fire Ins. Exchange v. American States Ins., supra* note 14; *American States Ins. Co. v. Hartford Accident & Indemnity Co.*, 218 Kan. 563, 545 P.2d 399 (1976).

[21] See *Royal Ind. Co. v. Aetna Cas. & Sur. Co., supra* note 1.

[22] See, generally, 15 Russ & Segalla, *supra* note 8, §§ 218:33 and 218:37.

[23] See *Fire Ins. Exchange v. American States Ins., supra* note 14. But see, *U. S. Fire Ins. v. State Farm Ins., supra* note 18; *American States Ins. Co. v. Hartford Accident & Indemnity Co., supra* note 20.

[24] See *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 77 Cal. Rptr. 2d 296 (1998).

[25] 15 Russ & Segalla, *supra* note 8, § 217:5.

coinsurer had a legal obligation to provide a defense or indemnity coverage for the claim or action prior to the date of the settlement.[26] In this sense, equity provides no right for an insurer to seek contribution from another insurer who has no obligation to the insured.[27] Further, an insurer will normally be compelled to contribute no more than the limits fixed in its policy.[28] Nevertheless, contribution in a concurrent insurer scenario is a right of the insurer flowing from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden.[29] It is a right independent of the rights of the insured.[30]

[12] There is therefore little question that liability for the loss among concurrent insurers should be allocated without regard to comparative fault or other subrogation-related questions such as lack of privity or the applicability of a contribution-among-joint tort-feasors statute.[31] Such questions are irrelevant to the underlying contractual obligations for a covered occurrence.[32] Moreover, a contribution rule based on apportionment of fault "would hamper settlements and require the defendant to prove its own fault before the defendant's insurer could seek equitable contribution."[33]

The only case in Nebraska concerning a concurrent insured is *State Farm Mut. Auto. Ins. Co. v. Union Ins. Co.*[34] The driver who was involved in an accident with a deer was covered under both his father's automobile insurance and

---

[26] *Mutual of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wash. 2d 411, 191 P.3d 866 (2008).

[27] *Id.*

[28] 16 Mark S. Rhodes, Couch Cyclopedia of Insurance Law § 62:15 (1983).

[29] *Mutual of Enumclaw Ins. Co. v. USF Ins. Co.*, supra note 26.

[30] *Id.*

[31] See *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, supra note 24.

[32] *Fire Ins. Exchange v. American States Ins.*, supra note 14.

[33] *Id.* at 663, 46 Cal. Rptr. 2d at 140.

[34] *State Farm Mut. Auto. Ins. Co. v. Union Ins. Co.*, 181 Neb. 253, 147 N.W.2d 760 (1967).

the automobile insurance of the parties in possession of the vehicle, which had been loaned to them by a repair shop, and who gave the driver permission to use the vehicle. One insurer paid the damages resulting from the collision and sought to recover from the other insurer one-half of the sums paid. Both policies had excess insurance clauses. We held that the excess insurance clauses were mutually repugnant, explaining, "If literal effect were given to the clauses in both policies, the result would be that neither policy covered the loss, and thus produce an unintended absurdity."[35] We observed that the parties failed to present evidence as to the exact amount of coverage of each policy or of the premiums paid, upon which pro rata apportionment could have been made. "In any event," we concluded that "where both companies stand on an equal footing, equity requires an equal apportionment of the loss."[36]

### 3. Concurrent Insurer Analysis in Hybrid Scenario

The parties' apparent confusion in this case is perhaps understandable. For if we were to accept Regent's contention that Beacon Hill is not insured under the respective American Family and Regent policies for the "same risk," then this is a hybrid of the two kinds of contribution: (1) an insurer of a joint tort-feasor which has paid all, or greater than its share, of a loss and (2) a single insured which is covered by concurrent or "double" insurance, and one insurer paid all, or greater than its share, of a loss.

We have not addressed a situation where some, but possibly not all the insureds, are covered for the same risk. And legal authorities fail to explain whether insuring the "same entities" for purposes of a concurrent insurer analysis means ensuring all of the same entities, as Regent assumes.

But a handful of cases have considered this question. In the majority of those cases, at least where the insureds are also joint tort-feasors, courts have found the settlement determinative of

---

[35] *Id.* at 258, 147 N.W.2d at 763.

[36] *Id.* at 259, 147 N.W.2d at 763.

the insureds' liability and have apportioned the contribution in accordance with set principles applicable to the policies' other insurance provisions.[37] In other words, these courts apply a concurrent insurer analysis to hybrid facts. The respective fault of the tort-feasors, contribution-among-joint tort-feasor statutes, questions of privity, and so on, are not considered relevant. These courts consider the entire loss caused by the joint tort-feasors to be the joint obligation under the policies in question.

Thus, in *Towne Realty, Inc. v. Safeco Ins. Co. of America*,[38] one insurer covered both the apartment owner and the apartment manager and two other insurers insured only the manager. As in a standard concurrent insurer analysis, the court looked simply to the policy language to determine liability under the settlement that released the owner and manager of their alleged joint and several liability. The court found that the limits of the primary policy must first be exhausted, then the primary policy with an escape clause, then the umbrella policy.

*Graphic Arts Mut. Ins. Co. v. Essex Ins. Co.*[39] similarly presented a contribution action between an insurer of the apartment owner and the insurer of both the owner and the manager. As in a standard concurrent insurer situation, the court apportioned the common obligation of the entire settlement amount in accordance with the other insurance provisions of the policies. The court specifically rejected the argument that doing

---

[37] See, *Towne Realty, Inc. v. Safeco Ins. Co. of America*, 854 F.2d 1264 (11th Cir. 1988); *Graphic Arts Mut. Ins. Co. v. Essex Ins. Co.*, 465 F. Supp. 2d 1290 (N.D. Ga. 2006); *Ariz. Jt. Underwriting Plan v. Glacier, Etc.*, 129 Ariz. 351, 631 P.2d 133 (Ariz. App. 1981), *disapproved on other grounds, National Indemn. Co. v. St. Paul Ins. Companies*, 150 Ariz. 458, 724 P.2d 544 (1986). See, also, *Nationwide Mut. Ins. Co. v. Hall*, 643 So. 2d 551 (Ala. 1994); *Home Ins. Co. v. Cincinnati Ins. Co.*, 213 Ill. 2d 307, 821 N.E.2d 269, 290 Ill. Dec. 218 (2004); *American States Ins. Co. v. CFM Const. Co.*, 398 Ill. App. 3d 994, 923 N.E.2d 299, 337 Ill. Dec. 740 (2010);. But see *MIC Property and Cas. v. International Ins. Co.*, 990 F.2d 573 (10th Cir. 1993).

[38] *Towne Realty, Inc. v. Safeco Ins. Co. of America, supra* note 37.

[39] *Graphic Arts Mut. Ins. Co. v. Essex Ins. Co., supra* note 37.

so would require the owner's insurer to contribute toward the manager's indemnity and defense. The court refused to "speculate and assume what the allocation of liability would have been had the case not settled."[40]

In *Ariz. Jt. Underwriting Plan v. Glacier, Etc.*,[41] two insurers (one providing primary coverage and the other providing umbrella coverage) insured the physicians, their practice, and the nurse, who were all sued by the injured patient as joint tort-feasors. Those two policies paid a settlement with the patient. But the nurse, individually, also had a primary liability policy. The court affirmed that the nurse's insurer should pay its policy limits in contribution to the other two insurers. The court reasoned that the question of the nurse's underlying liability had been resolved by the settlement; the nurse's insurer knew of the litigation and chose not to participate. And contribution was proper because "[t]he interest, as well as the risk and subject matter of the policies, were identical as to [the nurse]."[42] "[W]here all three insurers were liable in some degree to pay the judgment and only two insurers satisfied it, the parties wrongfully compelled to pay the loss are entitled to contribution from the one who paid nothing."[43] It would be a "windfall" to the nurse's primary insurer to pay nothing "merely because a fellow primary insurer had additional excess coverage."[44]

We agree with this line of cases that a traditional concurrent insurer contribution analysis based on the policy language may be appropriate regardless of whether all insurers cover all the same entities. And we find that under the undisputed facts presented, the equities make such a policy-based, concurrent insurer apportionment appropriate here. NP Dodge's liability for the guest's injuries was conclusively determined by the

---

[40] *Id.* at 1299.

[41] *Ariz. Jt. Underwriting Plan v. Glacier, Etc., supra* note 37.

[42] *Id.* at 352, 631 P.2d at 134.

[43] *Id.* at 353, 631 P.2d at 135.

[44] *Id.* at 354, 631 P.2d at 136.

settlement, and any disputed allocation of fault within that liability is irrelevant.

### 4. BEACON HILL
#### AS COINSURED

In reaching this conclusion, we need not fully wade through the quagmire of arguments concerning whether Beacon Hill was, in all respects, covered for the "same risk" under both Regent's and American Family's policies. Yet, we cannot ignore that the policies before us establish as a matter of law that Beacon Hill was in some capacity also a coinsured under all the policies in question. This is properly part of our equity analysis that considers the nature of the claim, the relation of the insured to the insurers, the particulars of each policy, and any other equitable considerations.

Given Regent's own shifting theories, we have little sympathy for Regent's argument that we should take no notice of Beacon Hill's coverage under any Regent policy because it was not argued below. In any case, this issue was broadly presented by American Family's complaint for contribution and through its presentation of the policies to the district court.

Regent does not deny that, pursuant to the management agreement, Beacon Hill fell under Regent's primary policy definition of an additional insured, being "[a]ny person or organization whom you are required to add as an additional insured on this policy under a writer contract or agreement . . . ."

We find no merit to Regent's argument that Beacon Hill was not an additional insured under the umbrella policy because there was no "additional insured endorsement" in that policy. The umbrella policy stated that it covered "[a]ny person or organization who is an additional insured in the 'underlying insurance.'"

We also find no merit to Regent's argument that Beacon Hill cannot be considered a coinsured because it did not tender its defense to Regent. In none of the cases cited by Regent did the insurer seeking to deny contribution have actual notice of the underlying litigation and hire independent counsel to

monitor that litigation.[45] Moreover, the case law cited by Regent is based in the "'selective tender' rule,"[46] which seeks to honor the insured's right to knowingly forgo the insurer's assistance.[47] There is no evidence that Beacon Hill made such a selective tender here.

We reject any argument by Regent pertaining to its coverage of Beacon Hill that asks this court to relitigate the fault of the parties discharged in the settlement. And, as will be discussed further below, Regent's excess clause under the additional insured endorsement does not convert the primary coverage into umbrella coverage, and, therefore, into coverage for a different risk.

But, for purposes of this opinion, we need not analyze the arguments surrounding Regent's additional insured coverage limitation that the accident arise out of NP Dodge's work or on premises occupied by NP Dodge. And we do not decide whether the professional services exclusion applied. It is sufficient for our purposes here to note that absent a successful argument that such coverage limitation or professional services exclusion applied, Regent would have been liable under its coverage of Beacon Hill for the guest's entire loss, up to the policy limits, had Beacon Hill and NP Dodge selectively tendered their defense to Regent or had American Family gone defunct. These coverage limitations and exclusion, added by Regent to its rather complicated additional insured endorsement, are a particularly weak basis for Regent's arguments that as a matter of law there is no joint obligation, or that it is inequitably being asked to pay Beacon Hill's share of liability.

---

[45] See, *Casualty Indem. Ins. v. Liberty Nat. Fire Ins. Co.*, 902 F. Supp. 1235 (D. Mont. 1995); *John Burns Const. Co. v. Indiana Ins. Co.*, 189 Ill. 2d 570, 727 N.E.2d 211, 244 Ill. Dec. 912 (2000); *Chicago Hosp. Risk Pooling Program v. ISMIE*, 397 Ill. App. 3d 512, 925 N.E.2d 1216, 339 Ill. Dec. 95 (2010); *Mutual of Enumclaw Ins. Co. v. USF Ins. Co., supra* note 26.

[46] *Mutual of Enumclaw Ins. Co. v. USF Ins. Co., supra* note 26, 164 Wash. 2d at 417, 191 P.3d at 871.

[47] *John Burns Const. Co. v. Indiana Ins. Co., supra* note 45; *Mutual of Enumclaw Ins. Co. v. USF Ins. Co., supra* note 26.

Most important to our analysis, however, is that even without Beacon Hill as an insured under Regent's policy, Regent could have been liable for the entire amount of the guest's loss up to its policy limits by virtue of its coverage of NP Dodge. NP Dodge paid significant premiums to Regent in order to cover the kind of occurrence alleged by the guest and conclusively determined by the underlying settlement, which Regent closely monitored at every stage. Because NP Dodge was undisputedly a coinsured for the same risk under all the policies, and the only other entity, Beacon Hill, was jointly and severally liable with NP Dodge, and was additionally a coinsured under all the policies for at least some risks, there is certainly no inequity in apportioning liability under a concurrent insurer analysis.

### 5. No Estoppel

We find no merit to Regent's argument that American Family is estopped from claiming contribution. Six elements must be satisfied for the doctrine of equitable estoppel to apply: (1) conduct which amounts to a false representation or concealment of material facts or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct will be acted upon by, or influence, the other party or other persons; (3) knowledge, actual or constructive, of the real facts; (4) lack of knowledge and the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel.[48]

Regent's estoppel claim is based entirely on the claims adjuster communications that are in the record. Even viewing this evidence in the light most favorable to Regent, we do not find any of these elements have been met. Most fundamentally, we find no clear representation by American

---

[48] *Becton, Dickinson & Co. v. Nebraska Dept. of Rev.*, 276 Neb. 640, 756 N.W.2d 280 (2008).

Family's claims adjuster that American Family conceded Regent's policy would not be liable on the guest's claim until both the American Family primary and umbrella policies were exhausted. The communications between the claims adjusters seem focused on sharing the immediate defense costs, rather than the ultimate apportionment of any settlement. It was wishful thinking for Regent to interpret American Family's statement in the December 18, 2006, letter, "I do concur with your assessment regarding American Family's primary coverage of [NP Dodge]," as a concession that both American Family's primary policy and its umbrella policy would come first.

This is especially true in light of the almost incomprehensible letter by Regent, sent October 30, 2006, which the December 18 letter was responding to. And we note that the statements in Regent's October 30 letter, which induced American Family's alleged concession, were always internally viewed by Regent with skepticism and have since been abandoned.

### 6. Application of Concurrent Insurer Analysis in This Case

[13-15] We turn now to the policies in question to determine the proper apportionment of Regent's and American Family's common obligation as concurrent insurers. For coverage to be concurrent for purposes of contribution, it must be at the same level—primary to primary or excess to excess.[49] Furthermore, the loss between the primary insurers should be apportioned before considering the excess insurers' exposure.[50] Among policies at the same level, absent compelling equitable reasons, courts should not impose an obligation on an insurer that contravenes a provision in its insurance policy.[51] In particular, where two carriers have responsibility for a claim, the other insurance clause of each policy must be examined to determine

---

[49] See, e.g., 2 Windt, *supra* note 18, § 7:4.

[50] See *id.*, § 7:5. See, also, *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F. 3d 202 (5th Cir. 1996).

[51] *OneBeacon Amer. Ins. Co. v. Fireman's Fund Ins.*, 175 Cal. App. 4th 183, 95 Cal. Rptr. 3d 808 (2009).

whether there exists language which may govern the contribution each party should make.[52]

## (a) Which Policies Are Primary and Which Are Umbrella

In arguing that both its policies come after the $6 million in coverage under American Family's policies, Regent is essentially arguing that the excess insurance clause of its primary policy transforms that policy into an umbrella policy. We find no merit to this argument.

[16] A true excess insurance policy is one providing coverage conditioned upon the existence of a primary policy, which coverage does not begin until a loss exceeds a stated level.[53] Furthermore, in general, umbrella policy premiums are relatively small in relation to the amount of risk.[54] In addition to the language of the policies themselves, the $144,403 premium compared to the $22,522 make it clear which Regent policy was the primary policy and which was the umbrella policy.

[17] We agree with the majority of jurisdictions that hold that umbrella policies, as the only true excess insurance policies, incur liability only after the exhaustion of all other policies, including primary policies containing excess insurance clauses.[55] In other words, there is a difference between

---

[52] *Universal Underwriters v. CNA Ins.*, 308 N.J. Super. 415, 706 A.2d 217 (1998).

[53] 15 Russ & Segalla, *supra* note 8, § 219:24.

[54] *Id.*, § 220:32.

[55] Michael E. DeFao, *Topical Survey of Rhode Island,* **Insurance**—*Determining Payment Priority Among Multiple Insurers Claiming Only Excess Liability*—Liberty Mutual Insurance Co. v. Harbor Insurance Co., 603 A.2d 300 (R.I. 1992), 27 Suffolk U. L. Rev. 551 (1993). See, also, *Allstate Ins. Co. v. American Hardware Mut. Ins. Co.*, 865 F.2d 592 (4th Cir. 1989); *Towne Realty, Inc. v. Safeco Ins. Co. of America, supra* note 37; *Allstate Ins. Co. v. Employers Liability Assur. Corp.*, 445 F.2d 1278 (5th Cir. 1971); *Allstate Ins. Co. v. Executive Car and Truck*, 494 So. 2d 487 (Fla. 1986); *U.S. Fire Ins. v. Maryland Cas.*, 52 Md. App. 269, 447 A.2d 896 (1982); *Pru. Prop. Cas. Ins. Co. v. New Hamp. Ins. Co.*, 164 N.J. Super. 184, 395 A.2d 923 (1978); *NFU v. Farm and City Ins. Co.*, 689 N.W.2d 619 (S.D. 2004); 8A Appleman & Appleman, *supra* note 12, § 4909.85 (Cum. Supp. 2009); 15 Russ & Segalla, *supra* note 8, § 218:13.

a true excess policy providing coverage conditioned upon the existence of a primary policy, which coverage does not begin until a loss exceeds a stated level, and a primary policy with devices by which the primary insurer attempts to limit or eliminate its liability where another primary policy covers the risk.[56] We conclude that the American Family and Regent primary policies were at the same level for purposes of contribution. We thus look to the other insurance clauses of those policies to determine contribution between them.

### (b) Primary Policies

As to NP Dodge, there are compatible pro rata other insurance clauses for the concurrent Regent primary policies. As to Beacon Hill, however, there is American Family's pro rata other insurance clause versus Regent's excess other insurance clause.

That is a unique circumstance. Since our concurrency analysis rests primarily with the concurrency of NP Dodge alone, it is perhaps most proper to apply the compatible pro rata other insurance clauses. On the other hand, American Family has always conceded that its primary policy came "first" before Regent's primary policy. This is essentially a concession to American Family's excess other insurance clause.

American Family is correct that this is purely an academic question. Regardless of which excess insurance clauses we apply, the result in this case would be the same.

[18] Where an excess clause and a pro rata clause appear in concurrently effective policies, the pro rata clause is usually disregarded and full effect is given to the excess clause, making the pro rata policy the primary insurance.[57] If we were to apply this principle here, then Regent's comprehensive policy would be excess to American Family's business owner's package policy. However, the guest's loss exceeded the limits of either primary policy and they each have the same limit of

---

[56] 15 Russ & Segalla, *supra* note 8, §§ 219:24 and 220:33.

[57] *Id.*, § 219:51. See, also, e.g., *Schal Bovis, Inc. v. Casualty Ins. Co.*, 315 Ill. App. 3d 353, 732 N.E.2d 1179, 247 Ill. Dec. 847 (2000). But see, e.g., *Fireman's Fund Ins. Co. v. Maryland Cas. Co., supra* note 24.

$1 million. Therefore, each must contribute $1 million even if Regent's primary policy is considered "excess" to American Family's primary policy.

If we were to instead apply the pro rata clauses, American Family and Regent would likewise each have to contribute $1 million. Each having the same policy limits, their pro rata shares of the total loss up to their combined policy limits would have been equal.

Thus, under either theory, we conclude that the district court's distribution of the common liability of the primary policies was correct.

### (c) Umbrella Policies

[19] There were competing excess other insurance clauses in the two umbrella policies. The interaction of two or more policies containing excess insurance clauses creates circularity and could provide a windfall to whichever insurer's policy is read first.[58] Thus, the rule adopted by the majority of jurisdictions, and by this court in *State Farm Mut. Auto. Ins. Co. v. Union Ins. Co.*, is that the excess insurance clauses are mutually repugnant and that the liability should be shared by the insurers pro rata in the proportion that their respective policy limits bear to the entire loss.[59]

While in *State Farm Mut. Auto. Ins. Co. v. Union Ins. Co.*, we apportioned the loss equally between the two insurers without regard to policy limits, the policy limits were not in the record in that case. The district court in this case had the

---

[58] See, e.g., *State Farm Mut. Auto. Ins. Co. v. Bogart*, 149 Ariz. 145, 717 P.2d 449 (1986) (superseded by statute as stated in *Consolidated Enterprises v. Schwindt*, 171 Ariz. 452, 831 P.2d 828 (1991)); *Planet Ins. Co. v. Ertz*, 920 S.W.2d 591 (Mo. App. 1996); 8A Appleman & Appleman, *supra* note 12, § 4909 (Cum. Supp. 2009); Steven Plitt, The Claim Adjuster's Automobile Liability Handbook § 3:2 (2012), available at Westlaw CAALH.

[59] See, *Polenz v. Farm Bureau Ins. Co.*, 227 Neb. 703, 419 N.W.2d 677 (1988); *State Farm Mut. Auto. Ins. Co. v. Union Ins. Co.*, *supra* note 34. See, also, *State Farm Mut. Auto. Ins. Co. v. Bogart, supra* note 58; *Planet Ins. Co. v. Ertz, supra* note 58; 8A Appleman & Appleman, *supra* note 12, § 4909 (Cum. Supp. 2009); 15 Russ & Segalla, *supra* note 8, §§ 217:9, 217:11, and 219:47; Plitt, *supra* note 58. See, also, Annot., 12 A.L.R.4th 993 (1982).

policy limits before it and was therefore able to divide pro rata the loss that remained after exhaustion of the two primary policies. Thus, Regent, under its umbrella policy, was liable in contribution to American Family for four-ninths of the cost of payments made and to be made to the guest under American Family's umbrella policy. We find that apportionment was correct.

## VI. CONCLUSION

For all the reasons stated above, we agree with the district court's apportionment of the common obligation toward the guest's settlement. We affirm the district court's order granting summary judgment in favor of American Family.

Affirmed.